# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

**FILED**

JAN 05 2023

Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

**UNITED STATES OF AMERICA** and the **STATE OF TENNESSEE,**

*Plaintiffs, ex rel.*

[UNDER SEAL]

*Plaintiffs-Relators,*

*v.*

[UNDER SEAL]

*Defendants.*

Case No. 1:21-cv-84-TRM-SKL

**AMENDED COMPLAINT**

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

### PLAINTIFFS-RELATORS' <u>SEALED</u> AMENDED QUI TAM COMPLAINT

### FILED UNDER SEAL PURSUANT TO
### <u>THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)</u>

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION



**UNITED STATES OF AMERICA** and the **STATE OF TENNESSEE**

*Plaintiffs, ex rel.*

**JULIE ADAMS, M.D., STEPHEN ADAMS, M.D.,** and **SCOTT STEINMANN, M.D.**

*Plaintiffs-Relators,*

*v.*

**CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY (d/b/a Erlanger Medical Center and Erlanger Health System), UT-ERLANGER MEDICAL GROUP, INC., THE PLASTIC SURGERY GROUP, UNIVERSITY SURGICAL ASSOCIATES, P.C.,** and **ANESTHESIOLOGY CONSULTANTS EXCHANGE, P.C.,**

*Defendants.*

Case No. 1:21-cv-84-TRM-SKL

**AMENDED COMPLAINT**

**FILED UNDER SEAL**
Pursuant to 31 U.S.C. § 3730(b)(2)

**JURY TRIAL DEMANDED**

## PLAINTIFFS-RELATORS' <u>SEALED</u> AMENDED QUI TAM COMPLAINT

## FILED UNDER SEAL PURSUANT TO <u>THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)</u>

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................5

II.  PARTIES ......................................................................................................11

III.  JURISDICTION AND VENUE ...................................................................19

IV.  STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
    DEFENDANTS' FALSE CLAIMS ................................................................20

  A.  Government Health Care Programs ..............................................................20

  B.  Medicare and Medicaid Reimbursement Rules and Certifications .....................22

     1.  Medicare's Payment for Services of Attending Physician Surgeons in a Teaching
       Setting .............................................................................................23

     2.  Medicare Reimbursement Rules Pertaining to Reimbursement for Anesthesia ............26

     3.  Medicare and Medicaid Reimbursement Rules Pertaining to Informed Consent..........27

     4.  Laws Requiring That Physicians – not Their Staff – Order Services for Patients and
       Accompanying HIPAA Violations ...........................................................29

     5.  Stark Law Rules ..................................................................................31

     6.  TennCare's Reimbursement Policies ........................................................32

  C.  The False Claims Act and the Tennessee Medicaid False Claims Act..................33

V.  SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS ................................33

  A.  False Claims for Three Overlapping Surgeries or for two Overlapping Surgeries
     Lacking Adequate Resident Supervision ......................................................34

     1.  Erlanger's Practices Concerning Overlapping Surgeries................................34

     2.  Examples of Defendants' False Claims .....................................................45

  B.  Unreasonable and Unnecessary Anesthesia Claims ........................................63

  C.  Failure to Obtain Valid Informed Consent ...................................................63

  D.  False and Inadequate Recordkeeping ..........................................................66

  E.  Defendants Were Well Aware of Medicare and Medicaid Violations and Resulting
     False Claims Liability .............................................................................67

  F.  Defendants' Medicare and Medicaid Violations are Material..............................74

  G.  Defendants' Violations With Respect to Overlapping Surgeries are Just one Part of
     Erlanger's General Culture of Non-Compliance, Which has led to Additional False
     Claims ...............................................................................................78

     1.  Sharing of Log-In Credentials Leading to Additional False Claims For Work Not
       Performed by a Physician .....................................................................81

     2.  Stark Law Violations ...........................................................................99

i – Sealed Amended Qui Tam Complaint

      3. Other Examples of Erlanger's Culture of Non-Compliance and Additional False Claims Submitted by Defendants ............................................................................118

  H. Defendants Retaliated Against Plaintiffs-Relators and Terminated Doctors J. Adams and Steinmann in Violation of the False Claims Acts and State law..................................129

      1. Relators' Efforts to Stop Defendants' Continuing Violations .....................................130

      2. Defendants' Retaliatory Conduct Against Plaintiffs-Relators .....................................131

VI.   COUNTS ...............................................................................................................142

VII.  PRAYER FOR RELIEF ..........................................................................................150

VIII. JURY DEMAND.......................................................................................................151

ii – <u>Sealed</u> Amended Qui Tam Complaint

1.      "No man can serve two masters."[1] Despite this age-old proscription, Defendant

Chattanooga-Hamilton County Hospital Authority (d/b/a Erlanger Medical Center and Erlanger

Health System) ("Erlanger"), one of the seven largest public hospitals in the nation,[2] together

with Defendants UT-Erlanger Medical Group, The Plastic Surgery Group, University Surgical

Associates, P.C., and Anesthesiology Consultants Exchange, P.C., have allowed surgeons to

operate on as many as three patients at the very same time, leaving residents and interns alone

with anesthetized patients without appropriate medical back-up or supervision. More

specifically, to maximize Erlanger's recoupment of government monies for operating rooms and

other ancillary services, Defendants knowingly allowed, facilitated, and/or promoted surgeons to

double- and triple-book surgeries and recoup compensation for surgeries to which they were

otherwise not entitled.  Defendants, who previously violated the False Claims Act and were

subject to a Corporate Integrity Agreement, fully understood what they were doing; they

knowingly violated state and federal laws designed to protect patients and ensure the integrity of

the bills Defendants sought to have the government pay. Further, Defendants did not disclose

these practices to patients, in violation of the most fundamental rules of informed consent.

2.      Engaging in proscribed overlapping[3] surgeries was only part of Defendants'

wrongful schemes to cheat government healthcare systems while placing patients – many poor or

_____

[1] Matthew 6:24.

[2] *See* https://www.local3news.com/erlanger-ranked-7th-largest-public-hospital-in-nation/article_cf12bd84-0e6e-5233-b46c-c3ea5598ab57.html.

[3] Overlapping surgeries are frequently referred to as "concurrent" surgeries.  However, the term "concurrent" has murky and contradictory definitions in the medical community.  To avoid confusion, we will generally use the term "overlapping," but the two terms are synonymous for purposes of this Amended Complaint.

1 – Sealed Amended Qui Tam Complaint

a minority – at risk. Among other illegal conduct, Defendants induced physicians to refer patients to Erlanger by providing them with exorbitant compensation and permitting them to shirk legal and medical responsibilities or delegate those responsibilities to unqualified staff through shared credentials.

3.    Plaintiffs-Relators in this case, Doctors Stephen Adams, Julie Adams, and Scott Steinmann, are all highly established physicians and medical school professionals who have authored more than 400 articles. When they raised concerns about patient safety and compliance, the leadership of Erlanger deliberately turned a blind eye to the problems, deciding, instead, to focus negative attention upon those who dared to raise such issues. The Plaintiffs-Relators have been told to be quiet, shunned for even raising compliance problems, threatened and – when they persisted – punished, losing compensation, stature, and, ultimately, their jobs and academic positions because they were – in the view of Erlanger's leadership – a "threat to the enterprise." Defendants and their agents intentionally and unlawfully interfered with Plaintiffs-Relators' contractual relationship with the University of Tennessee.  Moreover, following Plaintiffs-Relators' termination, the Defendants and their agents intentionally and unlawfully interfered with their ability to find work and academic appointments elsewhere.  This conduct was retaliatory and intended to unlawfully interfere with Plaintiffs-Relators' prospective economic advantage.

4.    The Plaintiffs-Relators are three highly respected senior physicians, including Erlanger's former Chief Information Officer. This complaint is based on their personal experiences taking care of patients in the medical center, their review of records, and their insight into Erlanger's policies and practices.  Plaintiffs-Relators witnessed that Erlanger effectively instituted a two-tiered health system in which the most vulnerable patient populations

– patients who had poor health literacy or communication challenges, were "poor," or had no or inadequate insurance – were often relegated to "service patient" category status and received inferior care. Service patients were generally managed by residents with little supervision from the teaching physician. This system has disparately impacted low-income and minority patients, particularly those that are elderly or disabled.

5. Though Defendants' derelictions involved countless patients, this Complaint, brought under the federal False Claims Act and the Tennessee Medicaid False Claims Act (collectively, "FCA"), is about those surgeries and procedures involving patients whose treatments were financed with Medicare and Medicaid dollars. Despite their knowledge that compliance with billing rules governing informed consent, overlapping surgeries, anesthesia, and recordkeeping is material to the receipt of those dollars – and even after Plaintiffs-Relators apprised them of the problems – Defendants billed the government payors and kept the money.

6. The surgeries were often scheduled to start within fifteen to thirty minutes of one another and, in the case of three overlapping bookings, two or more surgeries frequently occurred entirely within the duration of a third. This routine practice meant unwitting patients were subjected to longer-than-necessary operating-room times and charges, often under anesthesia, often in the care of trainees, and nearly always without the backup of a properly qualified surgeon, despite legal requirements.

7. Operating room records – the *sine qua non* of a submission for payment to federal and state payors – were laden with half-truths, omissions of critical qualifying information, and flat out lies. Furthermore, billing requirements were ignored. For example, teaching surgeons regularly attested to the impossibility of being present for the entirety of two surgeries occurring simultaneously in order to bill for both procedures. Similarly, surgeons billed for services as the

3 – <u>Sealed</u> Amended Qui Tam Complaint

teaching physician in instances where three surgeries occurred at the same time despite being specifically prohibited from doing so by the regulations.

8. As Defendants were well aware, these derelictions and others violate standards established as conditions of payment by the federal government and the State of Tennessee for medical claims arising under Medicare, Medicaid, and other government-supported programs.

9. In addition to violations relating to overlapping surgeries and in further pursuit of financial gain, Defendants also violated the False Claims Act by allowing unqualified and unsupervised staff members to impersonate physicians and then perform tasks like generating and signing prescriptions, including for controlled substances, and signing orders for imaging studies and surgeries – all of which must be performed by a physician under Medicare and Medicaid rules. False claims were then submitted for those services. Further, Erlanger providers falsely created documents, including fabricating preoperative history and physical exams (H&Ps) without the required pre-surgical patient evaluation or encounter having occurred. H&Ps are bundled into the global surgical payment and are required as a CMS condition of participation.

https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnproducts/downloads/globallsurgery-icn907166.pdf;

https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/downloads/scletter08-12.pdf. Erlanger not only falsified the medical record but generated false documents to bypass these requirements.

10. Defendants also violated federal law governing referrals and remuneration paid to physicians in the healthcare setting, targeting additional and unlawful remuneration – above fair-market-value and for work not personally performed – as an inducement to the physicians who generate crucial revenue for Defendants through their referrals. This conduct violates conditions

of payment imposed by Medicare, Medicaid, and other government payors, and resulted in the submission of additional false claims.

11. Seeking to redress the foregoing violations, Plaintiffs-Relators bring this *qui tam* action on behalf of the United States and the State of Tennessee alleging federal and state FCA violations arising from surgical services and procedures provided to patients at Erlanger and additional claims set forth above that violate the rules and regulations of publicly funded insurance plans, including Medicare, Medicaid, TRICARE, and state employee health care plans (collectively "government payors" or "government health plans").

12. Doctors J. Adams, S. Adams, and Steinmann also bring this action as Plaintiffs seeking redress for the malicious and unlawful campaign of retaliation they have endured and for the consequent damages, under statute and at common law, they have suffered and continue to suffer. Their complaints relating to the Defendants' non-compliance certainly constitute protected conduct for which, as set forth below, they were punished and continue to be punished, with their distinguished careers now diminished if not destroyed. The punishment meted out violated the FCA's anti-retaliation provisions. Additionally, the Defendants' misconduct gives rise to state law claims sounding in contract and tort.

## I.    INTRODUCTION

13. The Centers for Medicare & Medicaid Services ("CMS") provides that a teaching physician must be present for the critical or key elements of each surgery. 42 C.F.R. § 415.172(a)(1). As the legislative history shows, CMS's predecessor, the Health Care Finance Administration ("HCFA"), expressly enacted the operative regulations after it "learned that some teaching physicians [were] billing Medicare and receiving Part B payment for services even when the service [wa]s performed by an intern or resident outside the presence of the teaching physician and the teaching physician ha[d] minimal involvement, or no involvement, in the

service."[4]

14.     CMS will pay for surgeries involving residents "***only*** if a teaching physician is present during the key portion of [the] service or procedure." 42 C.F.R. § 415.172(a) (emphasis added). Under the applicable billing rules, a teaching physician may leave a surgery ***only*** after the key or critical elements have been completed (residents may finish the non-critical parts).[5]

15.     But if the teaching physician leaves the first surgery to begin a second, CMS requires him/her to have arranged for ***another qualified surgeon to be immediately available to assist the resident in the first case should the need arise***.[6]

16.     Moreover, the services performed by interns and residents are already reimbursed under Medicare Part A. Because interns and residents are not fully accredited surgeons, CMS does not reimburse for surgical procedures performed by interns and residents without appropriate supervision. 42 C.F.R. § 415.170(b). Such supervision is a condition of payment. *See id*. ("Conditions for payment on a fee schedule basis for physician services in a teaching setting.").

17.     In the case of three overlapping surgical procedures, the teaching surgeon is considered to be acting in a supervisory role and CMS does not allow the surgeon to bill for professional fees at all.

18.     When a claim is paid for a teaching physician under a physician fee schedule and

---

[4] 60 F.R. 63124, at 63142 (HCFA Dec. 8, 1995) (available at https://www.govinfo.gov/content/pkg/FR-1995-12-08/html/X95-11208.htm (accessed Apr. 14, 2021)).

[5] Medicare Claims Processing Manual, Ch. 12, § 100.1.2.A (2022); *see also* CMS Manual System, Pub 100-04 Medicare Claims Processing (Transmittal 2303) (Sept. 14, 2011) (hereafter "2011 Manual") at 100.1.2.A (available at: https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R2303CP.pdf, (accessed Apr. 2, 2021)).
[6] *Id.* (emphasis added).

the teaching physician is not present or otherwise fails to comply with the billing requirements, CMS has paid for a service that was simply never provided.

19.     CMS also requires that an attending surgeon be present for the entire viewing of an endoscopic procedure[7] and for the entirety of surgical cases lasting five minutes or less.[8]

20.     For at least the last ten years, Defendants – in conspiracy with physicians and others working in multiple departments at Erlanger – caused the submission of false claims for reimbursement to government payors in violation of the federal False Claims Act and the Tennessee Medicaid False Claims Act.[9] Specifically, Defendants billed or caused others to bill public payors for overlapping surgeries that did not conform in material respects to Medicare and Medicaid rules and regulations designed, *inter alia*, to protect patient safety. These violations caused improper billing of Medicaid and Medicare for surgeries in which:

- the patient's surgeon – the teaching physician – scheduled procedures for two other patients such that all three operations occurred, at least in part, at the same time;

- the teaching physician was not present during the "key and critical" portions of the surgery;

- the teaching physician was not present for ***any*** portion of the surgery, leaving the resident to complete the procedure without any attending present;

- the patient was left alone with the resident during surgery at times when his/her surgeon was involved in another surgery *and* no other qualified teaching physician was made immediately available to assist if needed or in time of emergency;

- the patient was administered anesthesia that was not medically reasonable or necessary while waiting – sometimes for an hour or more – for his/her surgeon – the teaching physician – to conclude work in another surgery and scrub in;

_____

[7] *See* Medicare Claims Processing Manual, Ch. 12, § 100.1.2.A.5 (2022).

[8] *See id.* at § 100.1.2.A.3.

[9] 31 U.S.C. § 3729 *et seq*.; Tenn. Code Ann. § 71-5-181, *et. seq.*.

7 – <u>Sealed</u> Amended Qui Tam Complaint

- the patient did not give valid informed consent to the overlapping surgery because Erlanger's written informed consent documents failed to mention that the surgeon would be involved in another surgery at the same time;

- the surgeon failed to document overlapping surgeries appropriately or recorded that he was present for one or both entire cases when this was false; and/or

- the surgeon was not present for the entire viewing of endoscopic procedures or for the entirety of surgical cases lasting fewer than five minutes.

21.     To illustrate the extent of overlap of relevant surgeries, the following are graphical representations,[10] provided by Plaintiffs-Relators, of the timing and duration of some of the procedures carried out by surgeons at Erlanger:



A)                              B)                              C)

22.     Virtually every overlapping surgery Defendants have billed to Medicare and Medicaid is compromised by one or more of the violations detailed above. This is due in large part to Erlanger's profit-driven policies and practices, which effectively ensure that such derelictions occur, including, but not limited to:

- encouraging  and/or failing to discipline teaching physicians who bill government payors when they engage in three overlapping surgeries;

- in cases of two overlapping surgeries, encouraging and/or failing to discipline teaching physicians who are not present during the key and critical parts of one or both surgeries, readily available when residents are performing the surgeries, or present for the entire procedure when required;

- failing to require that another teaching physician be designated to be available to assist when patients are left alone with a resident during overlapping surgeries;

---

[10] Section V.A.1, *infra*, contains a chart detailing these non-compliant cases and dozens of others.

- designing patient consent forms that conceal facts regarding the surgeon's decision to conduct two or more surgeries at the same time;

- encouraging, ignoring, and/or failing to audit patient charts for teaching physicians' false attestations used to support false billing statements;

- ignoring, marginalizing, retaliating against or attempting to force out physicians, including Plaintiffs-Relators, who complained about Erlanger's practice of double- or triple-booking, including patient harm caused by such practices; and

- suppressing an internal investigation conducted by Erlanger about the above unlawful practices.

23.    These intentional and systemic acts and omissions continue to cause Defendants to routinely submit false claims for payment for surgeries and unreasonable and unnecessary anesthesia services to government payors, which pay for a significant proportion of surgeries at Erlanger annually.

24.    Further, Defendants know that they have been overpaid by Medicare and Medicaid in connection with these unlawful requests for payment but have not taken the appropriate steps to satisfy obligations owed to government payors.

25.    Had federal, state, and other government-sponsored health care programs known that Erlanger's surgical procedures, as outlined above, were not eligible for reimbursement, they would not have reimbursed Defendants for such procedures. Governing regulations forbid such reimbursement, and the legislative history, past prosecutions, and guidance from the Office of the Inspector General ("OIG") underscore the significance of these regulations and the importance of compliance.

26.    In addition to violations relating to overlapping surgeries, Defendants engaged in other categories of unlawful conduct that led to the submission of false and fraudulent claims for payment to the Government.

27.    First, in order to provide an additional inducement to its high-producing

physicians, Erlanger embraced the practice of allowing non-physician staff members to log-in to its electronic medical record systems *using a physician's credentials* in order to perform physician work. Despite being warned by Plaintiffs-Relators repeatedly about this practice over the course of years, including that it violated the Health Insurance Portability and Accountability Act, PL 104–191, August 21, 1996, 110 Stat 1936 ("HIPAA"), and gravely endangered patients by subjecting them to errors by unqualified staff members, Erlanger and its leadership feigned ignorance and allowed it to continue. As Erlanger was well aware, individuals using a single physician's credentials were often logged in at two or more work stations in different locations at the same time and were performing tasks that were required under law to be performed by a physician. As a result, Erlanger submitted numerous false claims for work performed by staff members impersonating physicians including ordering imaging studies, ordering surgical procedures, and issuing prescriptions.

28.     Second, and relatedly, because of its ongoing financial distress and because the ancillary revenue generated by surgeons and physicians employed by Erlanger provides the organization a desperately needed financial lifeline, Erlanger has been paying its surgeons and certain high-volume physicians unlawful remuneration for their referrals in violation of the Stark Law.[11] Erlanger's employed high-volume physicians and surgeons are plied with compensation above fair market value and/or for work not performed. They also receive special perquisites not provided to other employees in exchange for their referrals to Erlanger. This remuneration includes having unqualified staff members perform physician work, relieving surgeons of responsibilities and thus allowing them to perform more cases, earning more for both themselves

---

[11] This conduct may also constitute violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which makes it unlawful to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid.

through additional wRVUs[12] and Erlanger through additional referrals for ancillary services. In addition, Erlanger generally requires its physicians and surgeons to direct their referrals to Erlanger, but fails to comply with rules regulating such directed referral arrangements under the Stark Law.

29.     These corrupt practices have been embraced at the highest levels of the organization, leading to numerous false claims.

## II.     PARTIES

30.     The Plaintiffs **United States of America** and **State of Tennessee** are the real parties in interest in this *qui tam* action.

31.     Plaintiff-Relator **Stephen Adams, M.D.**, is a citizen of the State of Tennessee. He is licensed to practice medicine in Tennessee and Georgia. He is a Cum Laude graduate of the University of Tennessee Chattanooga and a graduate of the University of Tennessee Health Sciences Center College of Medicine ("UTCOM").[13] He completed a Family Medicine residency at the University of Alabama. Dr. Adams is board-certified in both Family Medicine and Medical Informatics and is an appointed Professor in the Department of Family Medicine, UTCOM in Chattanooga. He has authored or co-authored numerous book chapters and academic peer reviewed articles and has reviewed and edited manuscripts for multiple prestigious academic medical journals. In 1997, Dr. Adams became a Clinical Instructor at the Department of Family

---

[12] wRVU or RVU stands for "work relative value unit" and is the unit by which physician clinical productivity is typically measured, including by Medicare. Erlanger Surgeon employment contracts provide for additional per wRVU bonus compensation for surgeons who generate wRVUs above a certain threshold.

[13] There are several distinct UTCOM-related entities, including the UT Health Sciences Center, of which UTCOM is a division, as well as the Chattanooga unit of UTCOM, which has its main campus at Erlanger's Baroness Hospital. For purposes of this Complaint, all such entities are referred to collectively as UTCOM.

11 – Sealed Amended Qui Tam Complaint

Medicine, UTCOM and has subsequently advanced to the rank of Professor of Family Medicine. He served as the Family Medicine Residency Program Director (2007- 2014). He has served on countless Erlanger and UTCOM committees. In 2014 he became the Chief Medical Informatics Officer at Erlanger, and held the position of Chief Information Officer from December 2019 until June 2021. In the face of escalating retaliation, Dr. S. Adams resigned from his position at Erlanger and took a lower-ranking and lower-paying position outside of Erlanger.

32. Plaintiff-Relator **Julie Adams, M.D.**, is a citizen of the State of Tennessee and is licensed to practice medicine in Tennessee, Wisconsin, and Minnesota. She is a Summa Cum Laude graduate of Clemson University and a graduate of the University of Alabama School of Medicine. Between 2002 and 2008, Dr. Adams completed an orthopaedic surgery residency at the Mayo Clinic and, subsequently, a hand and upper-extremity fellowship in Philadelphia. She is a board-certified orthopaedic surgeon with a subspecialty certification in hand surgery. She currently serves on the Board of Directors for the American Association of Hand Surgeons, is the President of the Hand Surgery Endowment, and is an active member of multiple national orthopaedic and hand surgery professional organizations. She serves as the Chair of the Ethics and Professionalism Committee for the American Society for Surgery of the Hand and has chaired multiple national hand or orthopaedic surgery conferences. Dr. Adams practiced at the University of Minnesota Department of Orthopaedics from 2008 to 2014, and served as that department's Compliance and Risk Management Officer; she subsequently practiced at the Mayo Clinic from 2014 to 2019 where she achieved the rank of Professor of Orthopaedic Surgery. Dr. Adams is the author or co-author of more than 100 book chapters and peer-reviewed academic articles. In 2019, Dr. Adams and her husband, Dr. Steinmann, were recruited to join the faculty at UTCOM and to come to Erlanger. In July 2019, she entered a contract with Erlanger to

become an orthopaedic surgeon and another with UTCOM to be a Professor of Orthopaedic Surgery. Dr. J. Adams was terminated by Erlanger on March 29, 2021.

33.     Plaintiff-Relator **Scott Steinmann, M.D.**, is a citizen of the State of Tennessee and is licensed to practice medicine in Tennessee, Wisconsin, and Minnesota. He is a graduate of Columbia University and Cornell University Medical College. He completed an orthopaedic surgery residency at Columbia University, a shoulder and elbow fellowship at Columbia University, and a hand surgery fellowship at Mayo Clinic. He is a board-certified orthopaedic surgeon with a subspecialty certification in hand surgery. Dr. Steinmann served in the United States Navy as Chief Medical Officer on the U.S.S. Milwaukee and was attending orthopaedic surgeon and director of upper extremity surgery at the United States National Naval Medical Center in Bethesda, Maryland, now known as Walter Reed National Military Medical Center. After serving in the U.S. Navy, Dr. Steinmann practiced at the Mayo Clinic from 1999 to 2019, where he achieved the position of Professor of Orthopaedic Surgery. He is now Emeritus Professor of Orthopaedics at the Mayo Clinic College of Medicine.

To Doctor

# Scott P. Steinmann

His colleagues present this token of their esteem and of their gratitude for his national and international recognition as an expert in management of disorders of the upper extremity; for his unique ability to combine clinical practice and research; for his exemplary teaching skills serving as an emulative example to scores of residents, fellows, and colleagues; for his firm commitment to the team approach to patient care and his respect and gratitude for each member of the team; for his leadership service in national upper extremity societies; for his initiative and commitment to outreach in the health system; for his enthusiasm, inquisitive spirit, and wonderful sense of humor; for his love of family, cycling with wife Julie and daughters Sarah and Hannah, rowing on Silver Lake; and for his steadfast loyalty to that living body of high principles that were initiated by the FOUNDERS,

34.      Dr. Steinmann has served or presently serves as a member of numerous national

orthopaedic professional organizations and is the author or co-author of more than 300 published

works, including books, book chapters, and peer-reviewed academic articles. In 2019, Dr.

Steinmann and his wife, Dr. J. Adams, were recruited to join the faculty at UTCOM and he was also recruited to serve as the Chair of the UTCOM Department of Orthopaedic Surgery. He entered into contracts with both Erlanger and UTCOM for these positions. The terms of the contract were – along with salary guarantees at both institutions – three years as to Erlanger and five years as to his position as Chair at UTCOM. Dr. Steinmann was terminated by Erlanger on March 29, 2021.

35.    Defendant **Chattanooga-Hamilton County Hospital Authority (d/b/a Erlanger Medical Center and Erlanger Health System)** is a non-profit corporation affiliated with UTCOM. Its purported mission is "to compassionately care for people." Erlanger includes seven hospitals and emergency rooms, eight Express Care locations, three community health centers, and numerous physician practices ranging from family medicine to specialty care in Tennessee, Georgia, and North Carolina. Erlanger touts itself as a "nationally-acclaimed, multi-hospital health system" that delivers "the highest quality, to diverse populations, at the lowest cost, through personalized patient experiences across all patient access points."[14] Erlanger Baroness Hospital, located at 975 East 3rd Street, Chattanooga, Tennessee, serves as Erlanger's headquarters and is the primary UTCOM campus in Chattanooga.[15] It is the region's only academic teaching hospital as well as the only "Level 1" trauma center for patients from 50 counties.[16] Annually, more than "600,000 people are treated by the team of [Erlanger] healthcare professionals" and about 150 residents and fellows participate in graduate-level medical

---

[14] *See* https://www.Erlanger.org/about-us/about-us (accessed March 29, 2021).

[15] *Id.*

[16] *Id.*

training.[17] Erlanger is the nation's tenth largest public health system and is "increasingly recognized as one of the most influential."[18] For years, Erlanger has presented itself as an exceptional academic and healthcare institution, one that is trusted and relied upon by many hundreds of thousands of patients residing across a significant geographic region. Notwithstanding its noble marketing spin, however, Erlanger paid a $40 million settlement in 2005 to resolve allegations of government billing fraud leveled by DOJ and the State of Tennessee.[19]

36.     Defendant **UT-Erlanger Medical Group, Inc.** (a/k/a/ Erlanger Medical Group or "EMG") was a Tennessee nonprofit corporation with its principal address at 975 East 3rd Street, Chattanooga, Tennessee. It was a physician group and the professional home of many of the surgeons and medical leadership staff implicated in this complaint. Although it was officially dissolved and terminated on September 17, 2020, it remains active as a leadership and administrative entity at Erlanger to this day. On the Erlanger website, EMG is touted as "Tennessee's fastest growing physician practice" with a physician "who's right for you, near you."[20]

37.     Below is a flow chart depicting the relationships among Erlanger leadership, Erlanger's surgical departments, and the University of Tennessee at the time of Relators' employment:

---

[17] *Id.*; *see also* https://www.Erlanger.org/about-us/a-teaching-hospital/residencies-and-fellowships (accessed Apr. 5, 2021).

[18] *See* http://landing.Erlanger.org/annual-report/ (accessed Apr. 5, 2021).

[19] *See* https://www.chattanoogan.com/2005/10/24/74681/Erlanger-Agrees-To-Pay-40-Million-On.aspx (accessed Apr. 6, 2021).

[20] Because EMG's identity and staff are subsumed within Erlanger, it is generally referred to as Erlanger throughout this Complaint.



38. Defendant **The Plastic Surgery Group** ("PSG") is a Tennessee limited liability company with its principal address at 901 Riverfront Parkway, Suite 100, Chattanooga, Tennessee. Founded in 1958, PSG claims to be Chattanooga's largest plastic surgery practice and a nationally recognized innovator in cosmetic, plastic, and reconstructive surgery.[21] Relevant here, physicians at PSG practice medicine at and are paid by Erlanger, but some of the bills for their professional services, including those submitted to Medicare, are administered by PSG.

39. Defendant **University Surgical Associates, P.C.** ("USA") is a Tennessee corporation located at 979 East 3rd Street, Suite C-300, Chattanooga, Tennessee. Its physicians have admitting and surgical privileges at Erlanger Health System, among other medical facilities.

40. Defendant **Anesthesiology Consultants Exchange, P.C.** ("ACE") is a Tennessee corporation with its principal address at 979 East 3rd Street, Suite C235, Chattanooga, Tennessee. ACE is the sole provider of anesthesia services at Erlanger in Chattanooga. On its website, ACE states "[e]xcellence in anesthesia is our goal" and that its team approach allows its anesthesia providers to "individualize your anesthesia management while maintaining a consistently high quality of care throughout your surgical experience."[22] At the Erlanger

---

[21] *See* https://www.refinedlooks.com/our-practice (accessed Apr. 5, 2021).

[22] *See* https://aceanesthesia.com/about/ (accessed Apr. 5, 2021).

Baroness campus, ACE provides anesthesia services for "acute trauma, neurosurgery, cardiovascular, orthopaedic, urologic and general surgery specialties in 21 operating suites."[23]

41.     The names and titles of some individuals responsible for the conduct alleged herein are presented in the chart below.

| Name | Title |
|---|---|
| Chandra Alston | Associate Vice Chancellor for Human Resources, UTCOM |
| Sheila Boyington | Erlanger Board of Trustees, Chair as of July 2022 |
| Jeremy Bruce, M.D. | Orthopaedic Surgeon and Orthopaedic Residency Program Director, UTCOM Chattanooga |
| Mark Brzezienski, M.D. | Plastic Surgeon, PSG, Plastic Surgery Chair and Residency Program Director, UTCOM Chattanooga, |
| R. Phillip Burns, M.D. | Erlanger Board of Trustees; USA surgeon |
| Floyd Chasse | Sr. VP & Chief Human Resources Officer, Erlanger |
| Jim Coleman Jr. | New CEO of Erlanger, former Erlanger Board of Trustees |
| H. Kennedy Conner | Erlanger Board of Trustees |
| Bryce Cunningham, M.D. | Orthopaedic Surgeon |
| Julie Dean | Former Erlanger Chief Compliance Officer |
| Mark Freeman, M.D. | Erlanger Orthopaedic Medical Director; Head of "Ortho Board" |
| Warren Gardner, M.D. | Orthopaedic Surgeon and Orthopaedic Trauma Fellowship Director, UTCOM Chattanooga |
| John Germ | Erlanger Board of Trustees |
| Vicky Gregg | Erlanger Board of Trustees |
| Matthew Higgins, M.D. | Orthopaedic Surgeon and Erlanger Chief of Orthopaedics |
| Polly Hofmann | Former Senior Associate Dean, Faculty Affairs UTCOM, retired |
| William Jackson, M.D. | Former Erlanger CEO (terminated June 2022) and former Erlanger Chief Medical Officer |
| James Kennedy, M.D. | Plastic Surgeon, PSG (deceased) |
| Dirk Kiner, M.D. | Orthopaedic Surgeon |
| Meridith O'Keefe | Former Erlanger Senior VP of Physician Services |
| Linda Moss Mines | Erlanger Board of Trustees |
| Henry Okafor, M.D. | Urologic Surgeon |
| Karen Percent | Former Director Erlanger Audit Services |
| Olivia Ralph | UTCOM Senior Compliance Officer, Investigations/EEO/Title IX |

---

[23] *Id.*

18 – <u>Sealed</u> Amended Qui Tam Complaint

| Jason Rehm, M.D. | Plastic Surgeon, PSG |
| James Sattler | Former Erlanger Board of Trustees |
| Steve Schwab, M.D. | Chancellor, UTCOM |
| R. Bruce Shack, M.D. | Former Dean of UTCOM Chattanooga (retired Nov. 2021) |
| Amar Singh, M.D. | Urologic Surgeon and Chair of Urology, UTCOM Chattanooga |
| Scott Strome, M.D. | Executive Dean, UTCOM |
| Alana Sullivan | Former Erlanger Chief Compliance Officer |
| J. Britton Tabor | Former Erlanger Executive Vice President and CFO/Treasurer (terminated 2021) |
| Benjamin Waldorf, M.D. | Urologic Surgeon |
| Gerald Webb II | Former Erlanger Board of Trustees |
| Jeffrey Woodard | Erlanger Chief Legal Officer |
| Christopher Young, M.D. | Anesthesiologist (ACE), former Erlanger Chief of Staff, former Erlanger Board of Trustees (removed Nov. 2021) |

42.     On information and belief, other Erlanger surgeons, physicians, and personnel have been involved in improper overlapping surgeries and other violations and will be identified through discovery.

### III.     JURISDICTION AND VENUE

43.     Plaintiffs-Relators bring this action on behalf of themselves and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the State of Tennessee, pursuant to Tenn. Code Ann. § 71-5-181 *et seq.*

44.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

45.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 and 31 U.S.C. § 3730(h) occurred in this District. 31 U.S.C. § 3732(a).

46.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 and 31 U.S.C. § 3730(h) occurred in this District.

47.     Relators' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(c)(4)(A).

48.     To the extent that there has been a public disclosure unknown to the Plaintiffs-Relators, the Plaintiffs-Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Plaintiffs-Relators have material independent knowledge of the information on which the allegations are based and voluntarily provided that information to the Government before filing this *qui tam* action. *Id.* Plaintiffs-Relators have made additional disclosures of relevant information and analysis to the Government since the Complaint was filed on April 20, 2021.

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS

### A.     GOVERNMENT HEALTH CARE PROGRAMS

49.     The federal and state governments, through Medicare and Medicaid, including TennCare, are among the principal payors responsible for reimbursing Defendants for surgical services. Medicare is a federal government health program that primarily benefits the elderly and the disabled. It was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by CMS, which is an agency of the U.S. Department of Health and Human Services ("HHS").

50.     Medicare Part A covers the cost of inpatient hospital services, post-hospital skilled nursing facility care, and medical insurance. Medicare Part B covers the cost of the

physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician or, in the case of teaching hospitals, supervised by a teaching physician where strict requirements are satisfied.

51.     CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

52.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures.

53.     Hospitals generally are reimbursed under Medicare Part A on a reasonable cost basis for services provided to Medicare beneficiaries. Resident salaries are included among the costs for which hospitals are reimbursed under Part A; thus, services provided by residents typically cannot be billed under Medicare Part B.

54.     As a UTCOM-affiliated teaching hospital engaged in the training of residents, Erlanger is eligible to be reimbursed for the teaching activities of clinical faculty physicians (also referred to herein as "teaching physicians"). Under specified circumstances, teaching hospitals may also properly bill under Medicare Part B for any medical services provided by teaching physicians when a resident is involved in those medical services.

55.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses primarily for low-income patients. Funding for Medicaid is shared between the federal and state governments. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled

after Medicare's coverage. According to CMS, "[w]hen services are furnished through institutions that must be certified for Medicare, the institutional standards must be met for Medicaid as well."[24]

56.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees and retirees and their dependents. FEHBP is a collection of individual health care plans, including Blue Cross and Blue Shield plans, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the U.S. Office of Personnel Management.

57.     TRICARE is a federal program that provides civilian health benefits for military personnel, certain military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government.

58.     At all relevant times to the Complaint, applicable Medicaid and TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above. Medicare, Medicaid, TRICARE, FEHBP and other similar federal and state medical insurance programs are referred to collectively herein as "government payors."

### B.     MEDICARE AND MEDICAID REIMBURSEMENT RULES AND CERTIFICATIONS

59.     To participate in the Medicare Program, hospitals enter "provider agreements" with the Secretary of Health and Human Services ("HHS"). *See* 42 U.S.C. § 1395cc. The Medicare Program pays the hospital directly for covered inpatient and outpatient services provided to Medicare beneficiaries except for any deductibles or coinsurance, which are

---

[24] *See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/index.html?redirect=/certificationandcomplianc/02_asc s.asp (accessed Apr. 2, 2021).

collected from the beneficiaries. *Id.*

60.     When submitting claims for reimbursement to Medicare, the provider is required to certify on CMS Form 1500, *inter alia*, that: 1) the information on the form is true, accurate and complete; 2) sufficient information is provided to allow the government to make an informed eligibility and payment decision; 3) the claim complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment; and 4) the services on this form were medically necessary.[25] The form further requires the provider to certify that the services on the form were "personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE." *Id.*

### 1.     *Medicare's Payment for Services of Attending Physician Surgeons in a Teaching Setting*

61.     As explained above, in a teaching setting like that at Erlanger, in order to receive payment under Medicare Part B for services performed by a physician, the service must meet one of the following criteria: (a) the services are personally furnished by a physician who is not a resident or (b) the services are furnished by a resident in the presence of a fully licensed teaching physician. 42 C.F.R. § 415.170.

62.     If a resident participates in a service furnished in a teaching setting, the service is eligible for a physician fee schedule payment "*only* if a teaching physician is present during the key portion of any service or procedure for which payment is sought." 42 C.F.R. § 415.172(a) (emphasis added). This provision is a specific application of § 415.170. *See* 42 C.F.R. §§ 415.170(b) (services by a resident are not billable under Medicare Part B unless furnished in the

---

[25] CMS Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (accessed Apr. 2, 2021)).

presence of a teaching physician "except as provided in § 415.172").

63.    In the case of surgical, high-risk, or other complex procedures – such as all the procedures at issue in this Complaint – the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. 42 C.F.R. § 415.172(a)(1).

64.    If a teaching physician engages in two surgeries that overlap, the CMS Medicare Claims Processing Manual states, ***"[t]he critical or key portions may not take place at the same time***. When ***all*** of the key portions of the initial procedure have been completed, the teaching surgeon may begin to become involved in a second procedure." Medicare Claims Processing Manual, Ch. 12, at § 100.1.2.A.2 (emphasis added).

65.    Significantly, when a teaching physician "is not present during non-critical or non-key portions of the procedure and is participating in another surgical procedure, he/she ***must arrange for another qualified surgeon to immediately assist the resident in the other case should the need arise***." *Id.* (emphasis added).[26]

66.    Finally, "[i]n the case of ***three concurrent surgical procedures***, the role of the teaching surgeon . . . in each of the cases is classified as a supervisory service to the hospital rather than a physician service to an individual patient and ***is not payable under the physician fee schedule***." *Id.* (emphasis added). The teaching physician may not submit a claim for reimbursement under his/her name in such circumstances.

67.    In addition to the above, CMS also requires that a teaching physician be present for the entire viewing in an endoscopic procedure and for the entire procedure in surgical cases

---

[26] CMS regulations require participating hospitals to "assure that personnel are licensed or meet other applicable standards that are required by State or local laws." 42 C.F.R. § 482.11(c) (Condition of participation; Compliance with Federal, state, and local laws).

24 – <u>Sealed</u> Amended Qui Tam Complaint

lasting five minutes or less. *Id.* at § 100.1.2.A.3. and § 100.1.2.A.5 (2022).

68.    As the Senate Finance Committee Report, *Concurrent and Overlapping Surgeries: Additional Measures Warranted* (Dec. 6, 2016), notes, the American College of Surgeons ("ACS") confirmed and clarified CMS's guidelines in its own clinical guidelines in April 2016.[27] *Id.* at 4-5. As the Report notes, the ACS guidelines reflect what is necessary for patient safety. *Id.* Other surgical societies and organizations have also made public statements concerning overlapping surgeries and condemning the type of conduct alleged in this Complaint.[28]

69.    Moreover, CMS policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Medicare Carriers Manual, Part 3 CMS Pub. 14-3 (Rev. 1780); 42 C.F.R. § 415.172 *et seq.*; *see also* 60 Fed. Reg. 63124-01, 1995 WL 723389 (HHS Dec. 8, 1995).

70.    When a teaching physician seeks reimbursement for a service involving a resident in the care of his/her patients "it must be identified as such on the claim" and is not payable unless it complies with the Claims Processing Manual. 2011 Manual, at 100.1.8.B. In addition, "the teaching surgeon must personally document in the medical record that he/she was physically present during the critical or key portion(s) of both procedures." 42 C.F.R. § 415.172; *see also* 2011 Manual, at 100.1.2.A.2.

71.    In sum, the teaching physician must appropriately document his/her involvement

---

[27] *See* https://www.facs.org/about-acs/statements/stonprin (accessed Apr. 1, 2021).

[28] *See, e.g.*, https://www.plasticsurgery.org/Documents/Health-Policy/Positions/ASPS-Statement_Concurrent-Surgery.pdf (accessed Apr. 8, 2021);
https://www.healio.com/news/orthopedics/20160607/concurrent-surgery-defining-and-implementing-a-safe-practice (accessed Apr. 8, 2021);
https://www.aans.org/pdf/Legislative/Neurosurgery%20Position%20Statement%20on%20Overlapping%20Surgery%20FINAL.pdf (accessed Apr. 8, 2021).

in the surgery when the resident performs elements of the surgery in the presence of, or jointly with, the teaching physician. The documentation must include sufficient information about the work performed during key portions of both procedures in the notes.

72.    Medicare and Medicaid also require providers to make restitution when overpayments are identified unless the provider is without fault. *See* 42 U.S.C. § 1320a-7b(a)(3); *see also* 42 C.F.R. 405.350 *et seq.*; 42 C.F.R. § 489.20(b); OIG Compliance Guidance for Hospitals, 63 Fed. Reg. 8987, 8998 (HHS Feb. 23, 1998).

### 2.    *Medicare Reimbursement Rules Pertaining to Reimbursement for Anesthesia*

73.    Medicare reimburses anesthesia practitioners for the period of time during which they are "present with the patient." Medicare Claims Processing Manual, at 50 (Rev. 3583, 08-12-16). Specifically, the billing period or "anesthesia time" begins "when the anesthesia practitioner begins to prepare the patient for anesthesia services in the operating room or an equivalent area and ends when the anesthesia practitioner is no longer furnishing anesthesia to the patient, that is, when the patient may be placed safely under postoperative care." *Id.* Furthermore, anesthesia time is a "continuous" time block; the actual amount of time spent with the patient must be "reported on the claim" for payment. *Id.* For computing payment, anesthesia time is divided into 15-minute increments and rounded up to one decimal place. *Id.*

74.    Administering anesthesia to patients while they wait for extended periods for their surgeon to scrub in from another surgery that was intentionally scheduled and conducted at the same time is not reimbursable. This is because "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which … are not *reasonable and necessary* for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).

75.     It is not reasonable or necessary – indeed, it is dangerous – to place patients under anesthesia without medical justification.

### 3.     *Medicare and Medicaid Reimbursement Rules Pertaining to Informed Consent*

76.     Ensuring that Medicare and Medicaid patients have given adequate informed consent prior to medical procedures is a condition of participation in the Medicare program. *See generally* 42 C.F.R. § 482.13 (Condition of participation: Patient's rights). Obtaining proper informed consent is *also* a condition of payment. Specifically, the CMS State Operations Manual states that "[h]ospitals are required to be in compliance with the federal requirements set forth in the Medicare Conditions of Participation (COP) *in order to receive Medicare/Medicaid payment*." CMS – State Operations Manual – Regulations and Interpretive Guidelines for Hospitals (Rev. 151; 11-20-15) (emphasis added).

77.     Among other requirements, CMS's COPs include numerous informed consent rules designed to protect Medicare and Medicaid patients. For example, patients must be involved, *inter alia*, in their own plan of care and be offered the ability to refuse treatment. 42 C.F.R. § 482.13(b)(1) & (2). Medicare and Medicaid patients also have the "right to receive care in a safe setting." 42 C.F.R. § 482.13(c)(2). A "properly executed" informed consent form must be included in each patient's chart prior to surgery. 42 C.F.R. § 482.51(b)(2) (Condition of participation: Surgical services); *see also* 42 C.F.R. § 482.24(c)(2)(B)(v) (Condition of participation: Medical record services).

78.     CMS's adoption of interpretive guidelines for informed consent highlights the importance of compliance and the centrality of appropriate informed consent to payment under Medicare. CMS's *Hospital Interpretive Guidelines for Informed Consent*, extensively revised in

2007, state that a "well designed consent process" would, among other things, include:[29]

- A description of the proposed surgery, including the anesthesia to be used;

- The indications for the proposed surgery;

- Material risks and benefits for the patient related to the surgery and anesthesia, including the likelihood of each, based on the available clinical evidence, as informed by the responsible practitioner's clinical judgment. Material risks could include risks with a high degree of likelihood but a low degree of severity, as well as those with a very low degree of likelihood but high degree of severity;

- Treatment alternatives, including the attendant material risks and benefits;

- The probable consequences of declining recommended or alternative therapies;

- Who will conduct the surgical intervention and administer the anesthesia;

- Whether physicians other than the operating practitioner, including but not limited to residents, will be performing important tasks related to the surgery, in accordance with the hospital's policies. Important surgical tasks include: opening and closing, dissecting tissue, removing tissue, harvesting grafts, transplanting tissue, administering anesthesia, implanting devices, and placing invasive lines;

79. For surgeries in which residents will perform important parts of the surgery, the physician is encouraged to discuss the following with patients:

- That it is anticipated that physicians who are in approved post-graduate residency training programs will perform portions of the surgery, based on their availability and level of competence;

- That it will be decided at the time of the surgery which residents will participate and their manner of participation, and that this will depend on the availability of residents with the necessary competence; the knowledge the operating

___

[29] CMS "Revisions to the Hospital Interpretive Guidelines for Informed Consent" (Apr. 13, 2007) (https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/downloads/SCLetter07-17.pdf (accessed Apr. 2, 2021).

practitioner/teaching surgeon has of the resident's skill set; and the patient's condition; and

- ***Whether, based on the resident's level of competence, the teaching physician will not be physically present in the same operating room for some or all of the surgical tasks performed by residents.***

*Id.* (emphasis added).

### 4. *Laws Requiring That Physicians – not Their Staff – Order Services for Patients and Accompanying HIPAA Violations*

80.     Applicable law is clear that there are certain tasks that must be performed by a physician, not delegated to staff impersonating a physician. For example, under 42 C.F.R. § 424.10(a), physicians are supposed to "decide[] upon admissions, order[] tests, drugs, and treatments, and determine[] the length of stay" in the hospital. Similarly, under 42 C.F.R. § 412.3(a) a patient must be formally admitted "pursuant to an order for inpatient admission [issued] by a physician or other qualified practitioner." *See also,* 42 C.F.R. § 412.3(b) ("The order must be furnished by a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition. *The practitioner may not delegate the decision (order) to another individual who is not authorized by the State to admit patients*, or has not been granted admitting privileges applicable to that patient by the hospital's medical staff.") (emphasis added).

81.     Moreover, physicians must certify the necessity of services provided as a condition for Medicare payment. 42 C.F.R. § 424.10(a) (citing sections 1814(a)(2) and 1835(a)(2) of the Social Security Act). To that end, as a general rule, "all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary. . . . *Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary*." 42 C.F.R. § 410.32(a) (emphasis added). Similarly,

"imaging, clinical laboratory services, and DMEPOS items . . . must have been ordered by a physician or, when permitted, an eligible professional (as defined in § 424.506(a) of this part)." 42 C.F.R. § 424.507(a)(1)(i). Although there are other eligible professionals, including some physician assistants and nurse practitioners, who can order these types of services, *id.*, "[t]he claim . . . must contain the legal name and the National Provider Identifier (NPI) of the physician or the eligible professional . . . who ordered the item or service."[30]

82.    State law also required that physicians exercise oversight of physician's assistants and nurse practitioners working with them, which was not done.[31]

83.    Erlanger's embrace of password sharing to allow staff to impersonate physicians violates HIPAA, PL 104–191, August 21, 1996, 110 Stat 1936, because it allows unauthorized access to protected health information ("PHI"). HIPAA is a material set of provisions safeguarding patient privacy and, as such, is material to government insurers' decisions to pay claims. As Section 261 of HIPAA explains, the purpose of the statute is "to improve the Medicare program …, the Medicaid program …, and the efficiency and effectiveness of the

---

[30] Under Tennessee law, "'Health care prescriber' means a: (A) Physician licensed under chapter 6 or 9 of this title; . . . (C) Nurse licensed under chapter 7 of this title; . . . (F) Physician assistant licensed under chapter 19 of this title." Tenn. Code Ann. § 63-1-102. Medical assistants are not included among the "Health care prescribers" who may issue prescriptions, including for opioids. See also, Tenn. Code Ann. §§ 63-6-201, 63-6-203; 63-1-402 (requiring all prescribers of controlled substances to be licensed and to complete related CME).

[31] *See* https://publications.tnsosfiles.com/rules/1000/1000-04.20190812.pdf. At § 1000.4.4.(4) c Tennessee law also requires that, "[w]ithin ten (10) business days after the physician assistant has examined a patient who falls in one of the following categories, the supervising physician shall make a personal review of the historical, physical, and therapeutic data gathered by the physician assistant on that patient and shall so certify in the patient's chart within thirty (30) days: (a) when medically indicated; (b) when requested by the patient; (c) when prescriptions written by the physician assistant fall outside the protocols; (d) when prescriptions are written by a physician assistant who possesses a temporary license; and (e) when a controlled drug has been prescribed." Tenn. Comp. R. & Regs. 0880-02-.18(7). In addition, "a supervising physician shall personally review at least twenty percent (20%) of charts monitored or written by the physician assistant every thirty (30) days."

health care system, … through the establishment of standards and requirements for the electronic transmission of certain health information."

84.     Pursuant to HIPAA, Erlanger is required to "[i]mplement technical policies and procedures … to allow access [to PHI] only to those persons or software programs that have been granted access rights as specified in § 164.308(a)(4)." 45 CFR § 164.312(a)(1). It is also required to "[a]ssign a unique name and/or number for identifying and tracking user identity" as well as "[i]mplement policies and procedures to protect electronic [PHI] from improper alteration . . ." *Id.* at § 164.312(a)(2)(i) (emphasis added); *id.* at § 164.312(c)(1). Finally, Erlanger is required to "[i]mplement procedures to verify that a person or entity seeking access to electronic [PHI] is the one claimed." *Id.* at § 164.312(d).

85.     Erlanger is required under HIPAA to train all "members of its workforce" on policies and procedures with respect to protected health information. *See* 45 C.F.R. § 164.530(b)(1)-(2). It is also required to implement a "security awareness and training program" for all members of its workforce. *See* 45 C.F.R. § 164.308(a)(5). As an Accountable Care Organization, Erlanger is also required under 42 C.F.R. § 425.300 to provide compliance training and to have mechanisms to address compliance problems.

86.     While HIPAA violations on their own do not constitute false claims, the HIPAA violations here were carried out in pursuit of a fraudulent scheme, leading to the submission of false claims.

### 5.     *Stark Law Rules*

87.     The Stark Law, 42 U.S.C. § 1395nn *et seq.*, is a strict liability statute that prohibits physicians from referring Medicare and Medicaid patients for certain designated health services ("DHS") to any entity with which they have a financial relationship, including a "compensation arrangement," and prohibits that entity from submitting claims that result from

31 – Sealed Amended Qui Tam Complaint

such referrals, unless certain safe harbors are satisfied. A "'referral' by a 'referring physician'" is any physician's request for DHS or establishment of a plan of care that provides for DHS, 42 U.S.C. § 1395nn(h)(5)(A), (B), & (C), other than DHS that are "personally performed or provided by the referring physician" 42 C.F.R. § 411.351. Significantly, "[DHS] is not personally performed or provided by the referring physician if it is performed or provided by any other person, including, but not limited to, the referring physician's employees, independent contractors, or group practice members." 42 C.F.R. § 411.351. Thus, all of the inpatient and outpatient hospital services associated with DHS personally performed by a surgeon (*i.e.*, the surgery itself) are considered DHS. 42 U.S.C. § 1395nn(h)(6)(K).

88.     The statute defines compensation arrangement as "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity other than" exceptions not relevant here. 42 U.S.C. § 1395nn(h)(1)(A); see also 42 C.F.R. §§ 411.354(c) & (d). "Remuneration," in turn, is broadly defined as "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B)). Remuneration need not be in the form of a 'kickback'; instead, remuneration can include anything of value – and in any form.  Moreover, unlike the AKS, the remuneration need not be given in return for, or to induce, a referral for federal healthcare services.  The Stark Act is a strict liability statute; the purpose of the remuneration is irrelevant.

89.     Violations of the Stark Law render claims submitted to the government false claims.  Because compliance with the Stark Act (like the AKS) is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes can form the basis of liability under the FCA.

### 6.     *TennCare's Reimbursement Policies*

90.     At all relevant times to the Complaint, applicable TennCare regulations relating to

coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

### C. THE FALSE CLAIMS ACT AND THE TENNESSEE MEDICAID FALSE CLAIMS ACT

91.     The federal False Claims Act provides, *inter alia*, that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (3) conspires to violate the False Claims Act is liable for a civil penalty of not less than $11,803 and not more than $23,607[32] for each such claim, plus three times the amount of damages sustained by the government. 31 U.S.C. §§ 3729(a)(1)(A), (B), & (C). The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-182(a)(1)(A), (B), & (C), is substantially the same.

92.     These statutes also contain a "reverse false claims" provision, which holds liable persons or entities for knowingly retaining overpayments from the government. 31 U.S.C. § 3729(a)(1)(G); Tenn. Code Ann. § 71-5-182(a)(1)(D).

93.     In addition, the statutes prohibit employers from discriminating against an employee's terms and conditions of employment because of lawful acts done by the employee in furtherance of an *qui tam* action. 31 U.S.C. § 3730(h); Tenn. Code Ann. § 71-5-183(g).

### V.     SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

94.     Plaintiffs-Relators were dismayed to discover during their employment at Erlanger that Defendants flouted many established and legally mandated professional standards for patient safety and privacy.

---

[32] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 6, at 1725 (DOJ January 11, 2021) (setting forth 2021 adjustments). https://www.govinfo.gov/content/pkg/FR-2021-01-11/pdf/2020-29024.pdf (accessed Apr. 2, 2021).

33 – Sealed Amended Qui Tam Complaint

### A. FALSE CLAIMS FOR THREE OVERLAPPING SURGERIES OR FOR TWO OVERLAPPING SURGERIES LACKING ADEQUATE RESIDENT SUPERVISION

95.     Particularly troubling was Defendants' routine practice of allowing teaching surgeons and other high-volume physicians (collectively, the "Erlanger Surgeons") to book and conduct multiple surgeries or procedures at roughly the same time without adequate supervision over the participating residents. In addition to unnecessarily placing patients at greater risk of complications, these procedures violated Medicare and Medicaid rules on billing for the services of a teaching physician under Medicare Part B.

#### 1. *Erlanger's Practices Concerning Overlapping Surgeries*

96.     The practice of overlapping surgeries is a long entrenched "tradition" at Erlanger, as Dr. R. Bruce Shack, Dean of UTCOM Chattanooga, explained to Plaintiffs-Relators on February 22, 2021:

> *The tradition here has been you run two rooms.* You have your PAs or whoever it is, or your medical assistants, answering phone calls, taking care of business while you're in the operating room. And, you know, you have a, uh, a medical assistant or a senior resident in one room doing a case while you're in another room doing a case with a junior resident, but you know, you're available if you need to bounce back and forth.

(Emphasis added).

97.     In 1993 and 1994, during Dr. S. Adams' third and fourth years of medical school, he did clinical rotations at Erlanger.  Surgery was one of the rotations.  At that time, Erlanger residents routinely operated without direct supervision from attending surgeons. Surgeons dubbed the resident cases "service cases" because the patients generally were insured by government payors or lacked insurance accepted by PSG. Operations on "service" patients were typically supervised by a more senior resident.  Dr. S. Adams personally participated in numerous surgeries where this was the case. It was the normal procedure and no one questioned it.

34 – <u>Sealed</u> Amended Qui Tam Complaint

98.     Dr. S. Adams returned to Erlanger in 1997 as a faculty member in the Department of Family Medicine. The FM faculty practice includes low risk obstetrics and, at the time, depended upon the OB/GYN residents and faculty to provide backup for patients who developed complications or needed a c-section. In the first few years it was not uncommon for those patients to receive care (including surgical intervention) from a resident without the presence of an attending OB/GYN. Most of those patients were insured through Medicaid. There was ongoing friction between the OB/GYN residency and certain private obstetricians because the obstetricians enrolled large numbers of Medicaid patients but then did not actually attend the delivery. The expectation was that the residents would perform the delivery and then the private obstetrician would submit the charges to Medicaid without actually being present.

99.     Dr. Adams recalls that he was once walking down the hall in the labor and delivery area and a nurse started calling for help because a patient was giving birth unexpectedly; neither the attending obstetrician nor any resident was present on labor and delivery (the residents assigned to be there were performing emergency surgery). Dr. Adams stepped in and delivered the baby. He was asked to not document his presence at the delivery; he agreed to not submit a bill but insisted on putting a delivery note in the chart.

100.    In another instance, a graduate of the OB/GYN residency related a story where a patient experienced a cord prolapse (where the umbilical cord passes out before the baby is delivered). This is a true emergency as the baby will die quickly without an immediate c-section. She was a first-year resident at the time and the more senior residents were all in clinic. The event was paged as an emergency, but no one came until after she performed the emergency c-section alone and ran into complications. She was told they were aware of an emergency, but were confident in her skills and assumed "she had it covered." At the time this was standard

practice and this near miss did not trigger any immediate changes in policy or procedure.

101.    In a March 3, 2021, conversation between Dr. Steinmann and orthopaedic trauma surgeon Warren Gardner, M.D., an Erlanger Surgeon since 2010, Dr. Gardner explained:

> We used to have more opportunity for autonomy for residents. Tuesday, Wednesday, Thursday, *we always had a second room so a resident could run the room*. We don't anymore, the only day we potentially have that now is Thursday and then on weekends, sometimes, occasionally.

(Emphasis added).

102.    On March 25, 2021, orthopaedic trauma surgeon Bryce Cunningham, M.D., who was a resident at Erlanger from 2011 to 2016, explained to Dr. Steinmann:

> When I was a resident it was three [orthopaedic trauma surgeons], and the guy on call had two rooms every day, the next day, and *generally simultaneous rooms.* So the chief [resident] would be sort of doing fractures in one room, one of the three attendings in the other room, and they would be simultaneous. *Well, things have changed in the last ten years*, in terms of, I don't think the hospital wants – certainly doesn't want concurrent surgery going on, so you'd be talking about a flip room then.

(Emphasis added).

103.    In 2014, Dr. S. Adams became Erlanger's Chief Medical Information Officer. Through that role and through personal communications with Alana Sullivan, former Chief Compliance Officer for Erlanger, Yvonne Mazarredo, Erlanger's Compliance Auditor, and others, he was made aware of ongoing issues with non-compliant coding as well as ongoing audits of overlapping surgeries.

104.    Dr. S. Adams recalls that the 2015 report in the *Boston Globe* exposing problems with overlapping surgery at Massachusetts General Hospital sparked considerable concern and discussion at Erlanger. He frequently ate lunch at the same time as Orthopedic Chairman Richard Alvarez, M.D., and overlapping surgery was a frequent topic of conversation between him and others in the physician lounge. He repeatedly stated in Dr. S. Adams' presence that it