# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| THE STATE OF TENNESSEE, ex rel. | ) | |
| JULIE ADAMS, M.D., STEPHEN | ) | |
| ADAMS, M.D., and SCOTT | ) | |
| STEINMANN, M.D., | ) | |
| | ) | Case No. 1:21-cv-84 |
| *Plaintiffs*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| CHATTANOOGA-HAMILTON | ) | |
| COUNTY HOSPITAL AUTHORITY *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendant Chattanooga-Hamilton County Hospital Systems, doing business as Erlanger Medical Center and Erlanger Health Systems' ("Erlanger"), motion to dismiss (Doc. 117). For the reasons set forth below, Erlanger's motion (*id.*) will be **GRANTED IN PART** and **DENIED IN PART**.

## I.     PLAINTIFFS' ALLEGATIONS AND PROCEDURAL POSTURE

### A.     The Parties

Erlanger is a non-profit, regional health system that operates seven hospitals in Tennessee, North Carolina, and Georgia. (Doc 51, at 19.) This includes Erlanger Baroness Hospital, an academic teaching hospital, with approximately 150 residents and fellows participating in graduate-level training. (*Id.* at 19–20.) Erlanger is affiliated with University of

Tennessee Health Sciences Center College of Medicine ("UTCOM") and is the primary UTCOM campus in Chattanooga. (*Id.* at 19.)

Defendant Plastic Surgery Group ("PSG") is a limited liability company that contracts with Erlanger to provide services to its patients. (*Id.* at 21.) Defendant University Surgical Associates, P.C., ("USA") is a Tennessee corporation, the physicians of which have admitting and surgical privileges at Erlanger. (*Id.*) USA surgeon Dr. Phillip Burns sat on the Erlanger Board of Trustees ("Erlanger Board"). (*Id.* at 22.) Defendant Anesthesiology Consultants Exchange, P.C., ("ACE") is a Tennessee corporation that is the sole provider of anesthesia services at Erlanger, including for surgical procedures. (*Id*. at 21.) ACE anesthesiologist Dr. Christopher Young sat on the Erlanger Board. (*Id.*)

Plaintiffs are physicians whom Erlanger formerly employed. (*Id.* at 6.) Dr. Julie Adams was an orthopedic surgeon at Erlanger and a Professor of Orthopedic Surgery at UTCOM from July of 2019 until March of 2021. (*Id.* at 16–17.) Dr. Stephen Adams became the Chief Medical Informatics Officer at Erlanger in 2014 and later served as the Chief Information Officer at Erlanger from December 2019 until June 2021. (*Id.* at 16.) He was also a professor in the Department of Family Medicine at UTCOM. (*Id.* at 15.) Dr. Scott Steinmann was a surgeon at Erlanger and served as Chair of the UTCOM Department of Orthopedic Surgery from 2019 until July 2021. (*Id.* at 18–19.)

**B.    Medicare's Teaching Physician Regulations**

The Medicare Program is a federal health-insurance program for Americans aged 65 and older, as well as some people with disabilities. (*Id.* at 24.) To participate in the Medicare Program, hospitals must enter into "Provider Agreements" with the United States Department of Health and Human Services ("HHS"). 42 U.S.C. § 1395cc. Under these agreements, a hospital

2

submits claims to HHS for reimbursement for services it provides to Medicare beneficiaries. (Doc. 51, at 26–27.)

In teaching hospitals, resident physicians often participate in providing services under the supervision of teaching physicians. (*Id.* at 27.) However, Medicare regulations only allow payment for teaching-physician services if the teaching physician personally provided the services, or if a resident provided the services while the teaching physician was present. 42 C.F.R. § 415.170. Furthermore, "in the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure." *Id.* § 415.172(a)(1). If the teaching physician engages in two surgeries that overlap, she can only leave the first surgery once the critical portions are completed. Dep't of Health & Hum. Servs., Medicare Claims Processing Manual Ch. 12, at § 100.1.2.A.2 (2019) (hereinafter, "Medicare Claims Processing Manual"). Even then, the teaching physician must designate another qualified physician to be available to assist the resident during the non-critical portions of the procedure. *Id.*

### C. Plaintiffs' Allegations

Plaintiffs allege that, in the course of their employment at Erlanger, they became aware teaching physicians were frequently permitted to conduct multiple resident-involved surgeries at the same time while submitting claims for the surgeries to Medicare as if the teaching physicians were present for the duration of each surgery.[1] (Doc. 51, at 38.) Plaintiffs learned that it is a "long entrenched tradition" for surgeons to operate in this way at Erlanger. (*Id.* (internal

---

[1] Plaintiffs note they learned this information partly through conversations they had with Erlanger's Compliance Department. (Doc. 52, at 3.)

quotations omitted).) Dr. Stephen Adams became personally involved "in data extraction for the purpose of analyzing overlapping surgeries." (Doc. 52, at 1.) Furthermore, Doctors Steinmann and Julie Adams witnessed teaching physicians "book[ing] two and sometimes three overlapping surgical cases . . . with the same teaching physician listed on each surgery." (*Id.*) Teaching physicians often scheduled the overlapping surgeries in different buildings, making it impossible for them to be "immediately available" if something went wrong with the resident-performed surgery. (*Id.* at 6.) Plaintiffs also learned that "Erlanger did not require that qualified back-up surgeons be designated to be immediately available to assist residents when their teaching physicians were participating in another surgery" and were told by Dr. Christopher Young, Erlanger Chief of Staff and a member the Erlanger Board of Trustees ("Erlanger Board"), that "Erlanger [does not] even comply" with the back-up surgeon requirement. (*Id.* at 2.) As a result of these practices, residents were left alone to conduct some or all of these surgeries without supervision. (*Id.*)

Plaintiffs identified claims submitted to the Government for 8,497 overlapping surgeries between 2017 and 2021.[2] (*Id.*) From this total, Plaintiffs identified ten examples of overlapping-surgery claims submitted by Erlanger to the Government. (*Id.* at 9–27.) These examples included the time and date of the surgeries for which claims were submitted, the type of surgery performed, the names of the surgeons who performed the surgeries, the amount of the claims, the date the claims were sent to the Government, and the date Erlanger received the payments. (*Id.*)

Plaintiffs also became aware that there was a "culture of non-compliance" with Medicare billing requirements at Erlanger. (Doc. 53, at 2.) Plaintiffs discovered a litany of violations of

---

[2] Plaintiffs allege that these cases are a small percentage of overlapping procedures conducted since 2011 and that the true number of overlapping procedures is in the tens of thousands. (Doc. 52, at 2.)

Medicare billing rules, including medically unnecessarily long periods of patients being anesthetized (Doc. 52, at 27), inadequate recordkeeping during surgeries (*id.* at 30), password sharing by physicians (Doc. 53, at 5), patients being admitted by non-physicians (*id.* at 17), patient test results not being reviewing by physicians (*id.* at 18), and the fabrication of patient physical examinations pre-surgery (*id.* at 21). Plaintiffs also allege they discovered that Erlanger improperly incentivized physicians to refer patients to Erlanger by offering them "excessive salaries and benefits" in violation of the Stark Law ("Stark") and Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b(b). (Doc 53, at 24.)

Over the course of many months, Plaintiffs raised their concerns about these alleged practices on multiple occasions with senior Erlanger leadership, including with Erlanger CEO Dr. William Jackson and Erlanger's Chief Compliance Officer, Julie Dean. (Doc. 54, at 14.) Plaintiffs notified them about a variety of issues including "billing and coding errors, professionalism issues, scope of practice, violations of Erlanger policy, and potential violations of federal statutes." (*Id.*) Plaintiffs also submitted an "e-safe report" detailing their concerns. (*Id.* at 21.) An e-safe report is intended to be a confidential means of raising concerns with Erlanger's Medical Executive Committee. (*Id.* at 22.) However, Plaintiffs allege that Erlanger Leadership gained access to the contents of the report. (*Id.*) Soon after Plaintiffs raised these concerns, Erlanger began to take adverse action against them. (*Id.*) The day after Plaintiffs submitted their e-safe report, CEO Jackson spoke to the Erlanger Board and argued that Plaintiffs represented a "threat to the enterprise." (*Id.*) Shortly after this meeting, on March 29, 2021, Erlanger terminated Dr. Julie Adams and Dr. Steinmann without cause, which put them in danger of losing their academic positions at UTCOM since "maintaining membership with Erlanger" was a condition of their employment. (*Id.* at 22, 24.) Dr. Stephen Adams was

threatened with termination and a reduced salary and ultimately resigned in the face of these threats. (*Id.*) He also was banned from participating in resident education. (*Id.* at 25.) Dr. Julie Adams and Dr. Steinmann have searched for other positions at teaching hospitals but have not been able to find employment due to Erlanger's continuing campaign of retaliation aimed at assassinating their characters. (*Id.* at 24.)

Plaintiffs initially filed this action on April 20, 2021. (Doc. 1.) Plaintiffs then filed an amended complaint on January 5, 2023. (Docs. 51–54.) Plaintiffs assert ten claims for violations of the Federal False Claims Act ("FCA") and the Tennessee Medicaid False Claims Act ("Tennessee FCA"):

1. 31 U.S.C. § 3729(a)(1)(A); (Count I: Presentment of False Claims)
2. 31 U.S.C. § 3729(a)(1)(B); (Count II: False Records)
3. 31 U.S.C. § 3729(a)(1)(C); (Count III: Conspiracy)
4. 31 U.S.C. § 3729(a)(1)(G); (Count IV: Reverse False Claims)
5. 31 U.S.C. § 3730(h); (Count V: Retaliation)
6. Tenn. Code Ann. § 71-5-182(a)(1)(A); (Count VI: Presentment of False Claims)
7. Tenn. Code Ann. § 71-5-182(a)(1)(B); (Count VII: False Records)
8. Tenn. Code Ann. § 71-5-182(a)(1)(C); (Count VIII: Conspiracy)
9. Tenn. Code Ann. § 71-5-182(a)(1)(D); (Count IX: Reverse False Claims)
10. Tenn. Code Ann. § 71-5-183(g); (Count X: Retaliation)

(Doc. 54, 26–31.) Plaintiffs also assert four tort claims under Tennessee law:

1. Breach of Contract
2. Tortious Interference with Business Relationships
3. Inducement to Breach of Contract
4. Intentional Interference with Prospective Business Relationships

(*Id.* at 31–34.) Erlanger filed a motion to dismiss on June 21, 2023. (Doc. 117.) This motion is now ripe for consideration.

## II.     STANDARD OF REVIEW

### A.     Federal Rule of Civil Procedure 8(a)(2)

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[Rule 8] demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id.* at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the truth of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of truth, however, does not extend to legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. The factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## B.      Federal Rule of Civil Procedure 9(b)

Rule 9(b) applies in cases in which a plaintiff alleges fraud and requires that "a party []

state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *Sanderson v.*

*HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006).  "To plead fraud with particularity,

the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the

fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury."

*Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (internal quotations and citation

omitted).  The purposes of Rule 9(b) are to "alert[] defendants to the precise misconduct with

which they are charged and protect[] defendants against spurious charges of immoral and

fraudulent behavior."  *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838

F.3d 750, 771 (6th Cir. 2016).  While this is a high bar, "so long as a [plaintiff] pleads sufficient

detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and

the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the

requirements of Rule 9(b) will generally be met."  *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*,

532 F.3d 496, 504 (6th Cir. 2008).

The Sixth Circuit has emphasized that, "Rule 9(b) should be interpreted in harmony with

Rule 8's statement that a complaint must only provide 'a short and plain statement of the

claim.'"  *Id.* at 503 (quoting Fed. R. Civ. P. 8(a)).  It has also cautioned that "[Rule9(b) should

not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by

the Federal Rules."  *Id.*; *see U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503

(6th Cir. 2007) ("*Bledsoe* II") ("When read against the backdrop of Rule 8, it is clear that the

purpose of Rule 9 is not to reintroduce formalities to pleading").  Therefore, "[a]lthough

conjecture and speculation are insufficient under Rule 9(b), [a court] must construe the complaint

in the light most favorable to the plaintiff [and] accept all factual allegations as true." *Prather*, 838 F.3d at 771 (citations omitted).

## III.   ANALYSIS

Plaintiffs' claims can be divided into four categories:  (1) the FCA Payment Claims; (2) the FCA Conspiracy Claim; (3) the FCA Retaliation Claim; and (4) the Tort Claims.[3]

### A.   FCA Payment Claims

"The FCA . . . is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *Bledsoe II*, 501 F.3d at 502–03.  Under 31 U.S.C. § 3729(a)(1)(A), a person is liable if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the Government.  A person is also liable under 31 U.S.C. § 3729(a)(1)(B) if he "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Claims brought under Sections 3729 (a)(1)(A) and (a)(1)(B) are often called "direct false claims" because these claims "cause the United States to remit money directly to claimants." *Walgreen*, 591 F. Supp. at 303 (citations omitted). Furthermore, "[the FCA] imposes liability on one who accepts overpayment from the government and fails to refund that overpayment—a so-called 'reverse false claim.'" *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017); *see* 31 U.S.C. § 3729(a)(1)(G).

---

[3] The Court's analysis of Plaintiffs' Federal FCA claims applies equally to their claims under the Tennessee FCA because the provisions of the Tennessee FCA are coextensive with the Federal FCA. *See United States v. UT Med. Grp., Inc.*, No. 2:12-cv-02139, 2014 WL 12611244, at \*4 n.2 (W.D. Tenn. May 21, 2014) ("The elements of [the Federal FCA and Tennessee FCA] are virtually identical. . . . Accordingly, the analysis of the sufficiency of the pleading is equally applicable to both statutory claims."); *see also United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 304 (E.D. Tenn. 2022) ("Both parties agree that the False Claims Act is co-extensive with the Tennessee Medicaid False Claims Act, so the Court will begin and end its analysis with the United States' claims under the False Claims Act.").

Here, Plaintiffs allege that Erlanger submitted claims for reimbursement which were false for a variety of reasons. These alleged false claims can be sorted into two categories: (1) non-compliant overlapping surgery claims; and (2) general non-compliance claims.

### i.      *Non-Compliant Overlapping Surgery Claims*

To plead a direct false claim, "the plaintiff must sufficiently allege that: (1) the defendant made a false statement or created a false record; (2) with scienter; (3) that was material to the Government's decision to make the payment sought in the defendant's claim; and (4) that the defendant submitted [the false record] to the U.S. government causing it to pay the claim." *Prather*, 892 F.3d at 830 (quotations and citations omitted). Furthermore, since claims under the FCA are fraud allegations, the claims are subject to Rule 9(b)'s heightened pleading requirements. *Sanderson*, 447 F.3d at 877; *see U.S. ex rel. Marlar v. BWXT Y-12*, L.L.C., 525 F.3d 439, 445 (6th Cir. 2008) ("The elements of an FCA action must be pleaded with the particularity required by Rule 9(b)."). "Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a[n] FCA violation in compliance with Rule 9(b)." *Bledsoe II*, 501 F.3d at 504. To plead an FCA violation with sufficient specificity, a plaintiff must allege: "(1) precisely what statements were made in what documents . . . (2) the time and place of each such statement and the person responsible for making [the statement], (3) the content of [the] statements and the manner in which they misled the government, and (4) what the defendants obtained as a consequence of the fraud." *Sanderson*, 447 F.3d at 877 (citations omitted).

Here, Plaintiffs identified ten specific examples of overlapping surgery claims submitted by Erlanger to the Government. (Doc. 52. at 9–27.) These examples include the time and date of the surgery for which the claim was submitted, the location where the surgery was performed,

the type of surgery performed, the name of the surgeon who performed the surgery, the amount

of the claim, and the date the claim was sent and the date the payment was received by Erlanger.

(*See id.*)  For instance, the "Patient 7" claim reads in full:

> Patient 7:  9:00 a.m. – 12:37 a.m. (3:37), BEH Main OR, Medicare Part A/B,
> Partial Cystectomy.  Erlanger submitted Part A and Part B claims to Medicare for
> Patient 7's surgery and related inpatient services.  Specifically, Erlanger
> submitted claims for the primary surgical procedure "partial cystectomy"
> provided by Dr. Singh occurring on July 27, 2018, in the amounts of $62,491.55
> and $4,934.00 for Medicare Part A and Part B, respectively.  Claims were sent
> beginning August 7, 2018, and final payments were received by Erlanger on
> August 29, 2018, and September 10, 2018, for Medicare Part A and Part B,
> respectively.  Medicare paid $1,373.47 for Part B and $12,376.88 for Part A
> coverage of the surgery.

(*Id.* at 17.)  Plaintiffs also include the time, date, and location of the other surgeries that

overlapped with the "Patient 7" surgery and provide graphical representations of the overlapping

surgeries.  (*Id.* at 9–27.)  Erlanger does not contest that Plaintiffs have presented specific

examples of claims that were submitted to the Government (Doc. 118, at 16) or that complying

with Medicare's teaching-physician regulations is material to the Government's decision to pay a

claim (*id*. at 23).  Erlanger instead argues Plaintiffs have not alleged that these claims are "false"

or that it knew the claims were false when it submitted them.  (*Id.* at 18, 24.)

> a.  Falsity

To plead "falsity," a plaintiff must allege that "the defendant made a false statement or

created a false record."  *Prather*, 892 F.3d at 830 (quotations and citations omitted).  Medicare

regulations require that "[i]n the case of surgical, high-risk, or other complex procedures, the

teaching physician must be present *during all critical portions* of the procedure and immediately

available to furnish services during the entire service or procedure."  42 C.F.R. § 415.172(a)(1)

(emphasis added).  If the teaching physician engages in two surgeries that overlap, she can only

leave the first surgery once the critical portions are completed.  Medicare Claims Processing

Manual Ch. 12, at § 100.1.2.A.2. Even then, the teaching physician must designate another qualified physician to be available to assist the resident during the non-critical portions of the procedure. *Id.* "When submitting a claim for reimbursement, a teaching physician must state whether a resident participated in the service provided and must fully comply with the [Medicare Claims Processing] Manual." *United States ex rel. Wollman v. Gen. Hosp. Corp.*, 394 F. Supp. 3d 174, 182 (D. Mass. 2019) (citing Medicare Claims Processing Manual).

The parties do not dispute that "Medicare rules . . . prohibit concurrent surgeries where the key and critical portions overlap." (Doc. 118, at 8 (internal quotations omitted).) However, Erlanger states that there is nothing inherently wrong with submitting claims for overlapping surgeries provided that the critical portions of the surgeries don't occur at the same time. (*Id.*) Therefore, Erlanger argues that because "[Plaintiffs] do not identify—or even attempt to identify—when the key and critical portions of any surgery occurred" in their examples, Plaintiffs have not alleged that these surgeries violated Medicare rules. (*Id.* at 18.)

Erlanger's argument fails for two reasons. First, when reading the complaint as a whole and drawing reasonable inferences in their favor, Plaintiffs do allege that the critical portions of the identified surgeries occurred at the same time.[4] Plaintiffs assert that it is "Erlanger['s] routine practice [to] allow[] teaching surgeons . . . to book and conduct multiple surgeries or procedures at roughly the same time without adequate supervision over the participating residents." (Doc. 51, at 38.) Indeed, that is the thrust of this entire case. Plaintiffs allege that they personally witnessed "residents in training [left] alone to conduct some or all of a patient's

---

[4] Plaintiffs state that "the terms ['concurrent' and 'overlapping'] are synonymous for the purposes of this Amended Complaint." (Doc. 51, at 5.) While the Court does not accept Plaintiffs' legal conclusion that the Government uses these terms interchangeably, the Court does accept that Plaintiffs use the terms interchangeably and will construe the examples of "overlapping" surgeries to be alleged examples of "concurrent" surgeries.

surgery without the guidance of a teaching surgeon, who was often not present at all." (Doc. 52, at 1.) Plaintiffs also provide statements from Erlanger surgeons which suggest that Erlanger conducted non-compliant overlapping surgeries. (*See, e.g.*, *id*. at 8 (relating what an Erlanger surgeon would typically tell his residents: "I want you to work on this, I'm going to get started with you, going to leave and go do this and come back – check on you.").)

It is true that Plaintiffs do not provide concrete evidence of when the critical portions of the identified surgeries occurred. However, Plaintiffs are not required to do so at the pleading stage, even under the heightened standard of Rule 9(b).[5] *See Prather*, 838 F.3d at 771 ("When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually prove his allegations."). As the Sixth Circuit has repeatedly noted, the purpose of Rule 9(b) is to give a defendant notice of the precise wrongful conduct it is being accused of. *Id.*; *see Bledsoe II*, 501 F.3d at 503 ("[T]he purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct."). Erlanger clearly knows what it is accused of and which claims are allegedly fraudulent. (*See* Doc. 143, at 7 ("The crux of Relators' [amended complaint] is that Erlanger allegedly violated [Medicare rules] by performing concurrent surgeries.").) Rule 9(b) is intended to be a shield to protect defendants from vague, baseless claims; it is not a sword to be used to destroy potentially meritorious complaints. *See Prather*, 838 F.3d at 771.

---

[5] Erlanger argues Plaintiffs must provide concrete evidence that the critical portions of the surgeries overlapped. (Doc. 118, at 18.) Under Erlanger's proposed standard, it would be extremely difficult for any plaintiff to adequately allege concurrent surgeries at the pleading stage since what is considered "critical" is left to the discretion of the teaching physician. (Doc. 118, at 14.) Pleading falsity would be nearly impossible in cases such as this, where Plaintiffs allege that the surgical records do not accurately reflect when the critical portions occurred or even when a surgeon was in the operating room. (Doc. 52, at 30.)

Second, Plaintiffs have alleged that the identified surgery claims are false because the surgeons did not comply with the back-up requirement. Plaintiffs allege that Erlanger never designated back-up surgeons for *any* overlapping surgery, which would of course include the ten example claims.[6] (Doc. 52, at 2.) While a sweeping allegation, Plaintiffs have alleged facts that support it. Plaintiffs allege that they were told by Erlanger Board member, Dr. Christopher Young, that Erlanger simply did not comply with the back-up surgeon requirement. (*Id.*) Plaintiffs also state that Erlanger had not adopted a back-up policy as of 2021, suggesting that no policy was ever in place. (*Id.* at 30–31.) Finally, Plaintiffs claim that Erlanger's surgery records "[do not] contain the name of a back-up teaching physician who was in fact immediately available," suggesting that these physicians were never designated. (*Id.* at 30.) The Court can infer from these facts that back-up physicians were not designated for the identified surgeries.

Plaintiffs have therefore sufficiently alleged that identified claims are false.[7]

> b.     Knowledge

Liability attaches under the FCA only if a false claim is "knowingly" submitted. 31 U.S.C. § 3729. A person acts knowingly if she: (1) "has actual knowledge of the [falsity of the] information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." *Id.*; *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023) ("[E]ither actual knowledge, deliberate ignorance, or recklessness will suffice."). Despite Rule 9(b) applying a heightened pleading

---

[6] Plaintiffs specifically allege that the claim submitted for Patient 5 was false because "it was impossible for [the surgeon] to be immediately available for [the surgery][,]" and Plaintiffs suggest that the surgeon did not designate a qualified back-up. (Doc. 52, at 11.)

[7] The parties also vigorously dispute whether three overlapping surgeries are per se false. (*See* Doc. 135, at 15.) Because the Court has determined that Plaintiffs have adequately alleged falsity, there is no reason for the Court to wade into this issue currently.

standard, it also specifically provides that "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see SNAPP*, 532 F.3d at 505 ("[A]n inquiry regarding [a defendant's] state of mind may only be pled generally.").

As an initial matter, Erlanger was aware that Medicare regulations provide that the critical portions of surgeries may not overlap and that a backup surgeon must be designated. Erlanger is a sophisticated player in the healthcare industry, operating seven hospitals in three states, and would naturally be familiar with Medicare billing requirements. (Doc 51, at 19.) Furthermore, on January 20, 2016, Erlanger held "an Executive Compliance Meeting" to discuss non-compliant overlapping surgeries. (Doc. 52, at 31–32.) In March 2017, Erlanger's Chief Compliance Officer gave a presentation on non-compliant overlapping surgeries which acknowledged that critical portions of overlapping surgeries may not overlap and that a physician must be immediately available to assist residents or else designate a back-up. (*Id.* at 32–34.)

Moreover, Plaintiffs have alleged facts suggesting that Erlanger knew the claims it was submitting for overlapping surgeries were false. When Dr. Stephen Adams created a report containing examples of non-compliant overlapping surgeries, Erlanger told him not to do it again because the report "would create too much liability for the organization." (*Id.* at 34.). This suggests that Erlanger knew that these examples represented false claims. *See, e.g.*, *Prather*, 892 F.3d at 837 (holding that a plaintiff pled knowledge when she alleged that she raised concerns about compliance but was told to ignore any issues). Similarly, CEO Jackson told the Erlanger Board that Dr. Julie Adams and Dr. Steinmann represented "a threat to the enterprise," which implies that Erlanger knew it had submitted false claims and was worried that they would be discovered. (Doc. 54, at 22); *see Wollman*, 394 F. Supp. 3d at 190 (finding that a plaintiff had

pled knowledge when "she [] described a reaction to internal allegations of non-compliance that . . . suggests a deliberate indifference and reckless disregard for the trust or falsity of the alleged non-compliance with applicable regulations and rules."). Perhaps most impactfully, Erlanger Board member Dr. Christopher Young told Dr. Stephen Adams that "[Erlanger] started [] deciding that we're going to control physicians or guide patients or *do things that are not legal*. Whether it's [] trying to do too many cases, or not coding right, or sharing your password, or *concurrent surgery* . . . " (Doc. 53, at 5) (emphasis added). These facts are sufficient for the Court to infer that Erlanger knew that the claims it was submitting were false or at least acted with deliberate indifference as to the truth of these claims.

Accordingly, Plaintiffs have adequately alleged a violation of the FCA for their claims of non-compliant overlapping surgeries.[8] Plaintiffs may proceed on those FCA claims that are premised on Erlanger's violations of teaching-physician regulations.

---

[8] "[The FCA] imposes liability on one who accepts overpayment from the government and fails to refund that overpayment—a so-called 'reverse false claim.'" *Ibanez*, 874 F.3d at 916; *see* 31 U.S.C. § 3729(a)(1)(G). "Instead of creating liability for wrongfully obtaining money from the Government, the reverse-false-claims provision creates liability for wrongfully avoiding payments that should have been made to the government." *Walgreen*, 591 F. Supp. 3d at 304 (quotations and citations omitted). A direct false claim also constitutes a reverse false claim if a defendant knowingly fails to repay the money it receives. *Id.* at 313. "It is, however, possible to be liable for a reverse-false-claims violation without having committed a prior initial violation—most prominently, in a case in which an overpayment was not originally made due to fraud but was fraudulently retained after it was identified." *United States v. Curo Health Servs. Holdings, Inc.*, No. 3:13-CV-00672, 2022 WL 842937, at *13 n.8 (M.D. Tenn. Mar. 21, 2022). As such, "[i]t is therefore permissible, and often appropriate, to plead reverse false claims liability as an alternative theory to recovery." *Id.* Here, Plaintiffs have sufficiently alleged a reverse false claim for the same reason that have alleged direct false claims.

Erlanger argues that Plaintiffs' reverse FCA claims should be dismissed because they are duplicative of the direct false claims. (Doc. 118, at 28.) However, it is appropriate to plead a reverse FCA claim in the alternative if there is a question as to whether a defendant knew that a claim was false at the time it was submitted. *See Curo*, 2022 WL 842937, at *13 n.8. As discussed above, Erlanger claims it did not know that the claims for non-compliant overlapping surgeries were false at the time it submitted the claims. If Erlanger is correct, it would not be liable under the direct FCA provisions. However, Erlanger would still be liable under the

## ii.      General Non-Compliance Claims

As noted above, *see supra* Section III.A.i., there is a strict requirement in this circuit that a plaintiff identify with particularity a false claim submitted to the Government for payment.  *See U.S. ex rel. Eberhard v. Physicians Choice Lab'y Servs., LLC*, 642 F. App'x 547, 550 (6th Cir. 2016) ("[The Sixth Circuit] imposes a strict requirement that relators identify actual false claims.") (quotations and citations omitted).  In *Bledsoe II*, the Sixth Circuit held "that where a relator pleads a complex and far-reaching fraudulent scheme with particularity and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme."  501 F.3d at 510.  However, the court also cautioned that "the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b)."  *Id.*  Therefore, "the [specific] examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims."  *Id.* (emphasis added).  The examples are "representative samples" if they are similar in terms of "general time frame, *substantive content*, and relation to the allegedly fraudulent scheme" to the extent that "the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the relator's representative samples."  *Id.* at 511 (emphasis added).  If a plaintiff "allege[s] separate and unrelated fraudulent conduct" then "Courts must proceed paragraph-by-paragraph to ensure compliance with Rule 9(b)" as to each scheme.  *Marlar*, 525 F.3d at 444; *see Bledsoe II*, 501 F.3d at 509 ("There is . . . no legitimate

---

reverse FCA provisions if it learned that these claims were false at a later date, for instance when Plaintiffs submitted their e-safe report.  Plaintiffs' reverse FCA claims are therefore not redundant.

reason for treating insufficient allegations of fraud that are placed in a complaint containing valid allegations differently from insufficient allegations of fraud that occupy their own complaint.").

As discussed above, Plaintiffs have presented representative claims of non-compliant overlapping surgeries. However, Plaintiffs allege a wide array of separate Medicare rule violations without identifying any examples of claims arising from these violations. (*See generally* Docs. 51–54.) These schemes include: (1) medically unnecessary periods of patients being anesthetized (Doc. 52, at 27); (2) inadequate recordkeeping during surgeries (*id.* at 30); (3) password sharing by physicians (Doc. 53, at 5); (4) patients being admitted by non-physicians (*id.* at 17); (5) patient test results not being reviewing by physicians (*id.* at 18); (6) the fabrication of patient physical examinations pre-surgery (*id.* at 21); and (7) performing medically unnecessary shoulder surgeries. (Doc. 54, at 11.)

It is clear that the non-compliant overlapping surgeries are not representative samples of these other schemes. *Bledsoe II*, 501 F.3d at 511. For instance, performing non-compliant overlapping surgeries is not substantively similar to allowing physicians to share their passwords. Erlanger, by looking at an overlapping surgery example, would not be able to infer that Plaintiff was also alleging that it was allowing physicians to share their passwords. Because each of these schemes represents "separate and unrelated fraudulent conduct," Plaintiff must provide a specific example of a claim submitted to the Government for each scheme.[9] *Marlar*, 525 F.3d at 444. Plaintiffs have not done so.

---

[9] Plaintiffs argue that these practices are not separate schemes to submit false claims, but rather one unified scheme to funnel "illicit renumerations to surgeons in numerous ways" so that "Erlanger could profit from their increased referrals of surgical cases." (Doc 135, at 22.) In other words, the scheme was to submit false claims in order to generate more revenue. While Plaintiff's framing is a creative attempt to tie together a variety of false claims, the Sixth Circuit has rejected defining a scheme at such a broad level, because it would defeat Rule 9(b)'s purpose of giving defendants notice as to what specifically they are being accused of. *Bledsoe II*, 501

Because Plaintiffs have not identified specific claims for the other schemes, Plaintiffs have failed to satisfy the heightened pleading requirement of Rule 9(b). As a result, Plaintiffs are precluded on proceeding on their FCA claims insofar as they are premised on these allegations of general non-compliance.

### B.      The FCA Conspiracy Claim

"[The FCA] imposes liability on anyone who 'conspires to commit a violation' of the FCA's other prohibitions." *Ibanez,* 874 F.3d at 916 (quoting 31 U.S.C. § 3729(a)(1)(C)). To establish an FCA conspiracy, a plaintiff must show two things: (1) an unlawful agreement made with the purpose of getting a false claim paid; and (2) a false claim that was submitted to the Government in furtherance of the conspiracy. *U.S., ex rel., Prather v. Brookdale Senior Living Cmty's, Inc.*, No. 3:12-CV-00764, 2015 WL 1509211, at *17 (M.D. Tenn. Mar. 31, 2015); *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 459 (6th Cir. 2018).

### i.      Agreement

To plead an FCA conspiracy, a plaintiff must allege facts that plausibly suggest the defendants made an agreement with the purpose of defrauding the government.[10] *Ibanez,* 874 F.3d at 917. While pleading a statement showing there is such an agreement is one way to do this, "general civil conspiracy principles apply [to FCA conspiracy claims]." *U.S. ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 n.3 (7th Cir. 1999); *see United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (applying civil conspiracy principals to an FCA conspiracy

---

F.3d at 510 (rejecting defining a scheme as "[the] defendant submitting false claims to Medicare or Medicaid.").

[10] Rule 9(b) provides that "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

claim).  Therefore, it is possible to infer the existence of a tactic or express agreement to defraud the government from the conduct of defendants.  *See United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 541 (E.D. Pa. 2022) ("The Court can 'infer the existence of an agreement' between [defendants] to violate the False Claims Act").  Indeed, as courts have acknowledged, "conspiracies are rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quotations and citations omitted); *see Jacobs v. Alam*, 915 F.3d 1028, 1043 (6th Cir. 2019) ("[I]t is enough to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy.").

Three facts alleged in Plaintiffs' complaint plausibly suggest that Defendants Erlanger, ACE, and USA had a tacit or express agreement to perform non-compliant overlapping surgeries for the purpose of submitting false claims:  (1) the extensive business relationship between Defendants; (2) Defendants' shared motive in performing non-compliant surgeries; and (3) Defendants' actions after being put on notice that their practices violated the FCA.  *See Bevill v. Fletcher*, 26 F.4th 270, 283–84 (5th Cir. 2022) (holding that a plaintiff had adequately pled a conspiracy when he alleged facts indicating a close working relationship between the defendants, a common motive, and a meeting between defendants in which a defendant urged the plaintiff's firing).

First, Plaintiffs allege that Defendants worked together on hundreds of non-compliant overlapping surgeries over the course of at least four years.  (Doc. 52, at 2.)  Plaintiffs allege that there were "8,497 overlapping surgical-cases performed at Erlanger" from 2017 to 2021 which resulted in false claims being submitted to the Government.  (*Id.*)  Plaintiffs claim that "Defendant USA was involved in 391 of [these cases]."  (*Id.*)  Plaintiffs further allege that ACE

was the sole provider of anesthesiology services for surgeries performed at Erlanger, so it is

reasonable to infer that ACE participated in the vast majority of these procedures.[11]  (Doc. 51, at

21–22.)  Plaintiffs also state that "Defendant PSG was involved in 660 [non-compliant

overlapping surgeries]" (Doc. 52, at 2.)  This long history of business dealings suggests a

relatively high level of knowledge, communication, and coordination between Defendants.  *See*

*Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983) ("The long-running nature of the

scheme is also crucial to the inference of agreement").  Moreover, Defendants ostensibly had

some ability to influence a policy of non-compliant overlapping surgeries because ACE

physician Dr. Christopher Young and USA surgeon Dr. Phillip Burns sat on the Erlanger

Board.[12]  (Doc. 51, at 22–23); *see Gelboim*, 823 F.3d at 781 (noting that courts may weigh "a

high level of interfirm communication" in considering whether an agreement was made).  PSG

did not have an employee sitting on the Erlanger Board.  (*See generally* Docs. 51–54.)

Second, Defendants shared a financial motive to perform non-compliant overlapping

surgeries.  By doing so, Defendants were able to bill Medicare for a greater number of services

---

[11] By alleging these facts, Plaintiffs have adequately demonstrated "when, where or how the alleged conspiracy occurred."  *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *17 (M.D. Tenn. Jan. 14, 2013) (citations omitted).

[12] Plaintiffs assert that Doctors Young and Burns were acting as representatives of ACE and USA respectively.  (*See* Doc. 54, at 27 ("Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees")).  ACE and USA deny this.  (*See* Docs. 140–141.)  However, because the alleged conspiracy would benefit ACE and USA, it is reasonable to infer that Doctors Young and Burns were acting consistently with the interests of those entities.  While it may be proven in time that Doctors Young and Burns were acting without the knowledge or authorization of ACE and USA "it is not [the Court's] task at the motion-to-dismiss stage to determine whether a lawful alternative explanation appears more likely from the facts of the complaint."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015); *see Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 517 (6th Cir. 2020) ("A plaintiff's specific allegations of a conspiracy will suffice as long as they are plausible . . . even if a defendant's briefing identifies a more likely alternative explanation for what occurred.") (internal quotations and citations omitted).

and therefore generate more revenue. (*See* Doc. 52, at 3 ("[Non-compliant overlapping surgeries] were scheduled at or about the same time so that the teaching physician could maximize the number of cases performed by him and his residents.").) Erlanger could submit more claims to Medicare for teaching physician services than it otherwise would be able to. (*Id.*) ACE could submit claims for longer periods of anesthesia because scheduling non-compliant overlapping surgeries results in patients being under anesthesia for extended periods while they wait for the teaching physician to finish the other overlapping surgeries. (Doc. 51, at 11.) While Plaintiffs do not explicitly state as much, reading the amended complaint as a whole, it appears Plaintiffs intend to allege that at least some USA surgeons are teaching physicians. Therefore, USA would stand to benefit from non-compliant overlapping surgeries because it could submit more claims via its teaching physician members.[13] PSG would presumably benefit as well as Plaintiffs allege that PSG submits claims to Medicare for "some of the bills for [PSG physicians'] professional services." (Doc. 51, at 21.)

Third, Plaintiffs allege that Defendants knew that submitting claims for non-compliant surgeries violated the FCA but continued to do so. Plaintiffs do not suggest that they ever notified any employee of PSG that they may be submitting false claims by participating in non-compliant overlapping surgeries. (*See generally* Docs. 51–54.) Plaintiffs state that they raised their concerns directly with Erlanger's leadership, as well as Doctors Young and Burns, and

---

[13] Plaintiffs have explicitly stated only that USA physicians have admitting and surgical privileges at Erlanger. (Doc. 51, at 21.) It is not entirely clear which services USA physicians generally provide, but the Court interprets the operative complaint as asserting that the USA physicians are teaching physicians at Erlanger. If USA physicians are not in fact teaching physicians, or if USA does not submit claims for services provided by teaching physicians, USA may seek relief from this order pursuant to Federal Rule of Civil Procedure 60.

therefore Erlanger, USA, and ACE had notice.[14]  (Doc. 52, at 2); (Doc. 54, at 14–15.)  Despite

being put on notice, Defendants continued to submit false claims and eventually the Erlanger

Board, which Doctors Young and Burns sat on, terminated Plaintiffs when it became clear that

they represented a "threat to the enterprise."  (Doc. 54, at 22–23.)

Drawing all reasonable inferences in favor of Plaintiffs, it is plausible that Erlanger,

ACE, and USA had a tacit or explicit agreement to submit false claims.  However, Plaintiffs

have not alleged facts which allow the Court to infer that PSG was a part of this agreement.[15]

### *ii.*        **Specific False Claim**

In addition to alleging an agreement, a plaintiff must also identify a specific false claim

submitted to the government as a part of the alleged conspiracy.  *See Crockett*, 721 F. App'x at

459 ("An FCA conspiracy requires a "request or demand" intended to be paid by the

government.") (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 670 (2008)).

This is an indispensable element of an FCA conspiracy claim.  *See, e.g., United States v. Wal-

Mart Stores E., LP*, No. CV 13-10568, 2019 WL 3936393, at *4 (E.D. Mich. Aug. 20, 2019),

*aff'd*, 858 F. App'x 876 (6th Cir. 2021) ("Relator's conspiracy claim fails simply because . . .

Relator failed to sufficiently allege any underlying violations of the FCA that would support it.").

Here, Plaintiffs have "identified a particular claim improperly made on the government

by virtue of the alleged conspiracy."  *Crockett*, 721 F. at 459.  As discussed above, *see supra*

---

[14] Plaintiffs also argue that Defendants knew they were submitting false claims because Plaintiffs "expressly detailed the fraud, including the violation of CMS billing rules in an e-safe report that was reviewed by Erlanger's Board of Trustees."  (Doc. 135, at 47–48.)

[15] As noted above, unlike ACE and USA, Plaintiffs did not inform any member of PSG that it may be submitting false claims.  (*See generally* Docs. 51–54.)   Similarly, PSG did not have a member sitting on the Erlanger Board.  (*Id.*)  Without alleging facts that suggest PSG was aware that it was submitting false claims, there is no basis to infer that it entered into an agreement with the other Defendants to do so.

Section III.A.i., Plaintiffs specifically identify ten false claims that Erlanger submitted for noncompliant overlapping surgeries. (Doc. 52, at 9–26). Because Plaintiffs have plausibly alleged that Defendants Erlanger, ACE, and USA entered into an agreement with the purpose of violating the FCA and identified a claim submitted in furtherance of the conspiracy, they have stated a claim upon which relief can be granted.

### C.     FCA Retaliation Claim

An employee is protected from being "discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop [one] or more violations [of the FCA]." 31 U.S.C. § 3730(h)(1). To plead an FCA Retaliation claim, a plaintiff must allege "that (1) she engaged in a protected activity, (2) the employer knew she engaged in the protected activity, and (3) the employer discharged or otherwise discriminated against the employee as a result of the protected activity."[16] *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017). "To plead protected activity, [a plaintiff] must allege conduct directed at stopping what he reasonably believed to be fraud committed against the federal government." *Id.* "Efforts to stop an FCA violation . . . include internal reports of fraud." *Jones-McNamara v. Holzer Health Sys*., 630 F. App'x 394, 399 (6th Cir. 2015). For an employer to have notice that a plaintiff is trying to stop an FCA violation, "an employee must show some linkage between the activities they complain of and fraud on the government." *Crockett*, 721 F. App'x at 461. It is sufficient, but not necessary, for an employee to "specify . . . her objections [are] founded in concerns about improper government disbursements." *Id*. A less specific statement can still give a defendant

---

[16] Because none of these elements require a showing of fraud, "[an] FCA retaliation claim [] need only meet the more lenient plausibility standards of Rule 8(a)," rather than the heightened pleading standard of Rule 9(b). *Crockett*, 721 F. App'x at 460.

notice if "[a defendant] would have understood [a plaintiff's] complaints to implicate fraud on the government." *Id.*

Here, Plaintiffs allege that they repeatedly raised concerns about Erlanger's practices over the course of many months in an effort to stop its practice of conducting non-compliant overlapping surgeries. In early 2018, Dr. Stephen Adams "brought up to Erlanger leadership . . . a systematic pattern of problematic surgical scheduling." (Doc. 54, at 14.) In May 2020, Plaintiffs raised concerns about "*billing and coding errors*, professionalism issues, scope of practice, violations of Erlanger policy, and *potential violations of federal statutes* to Dean, Erlanger's Chief Compliance Officer, and Percent, [Erlanger's Compliance Auditor]." (*Id.* (emphasis added).) In June 2020, Dr. Steinmann met with CEO Jackson about Defendant's practice of conducting non-complaint overlapping surgeries, telling him that "this [practice] has to stop yesterday." (Doc. 52, at 36.) Finally, Plaintiffs submitted an e-safe report detailing their concerns in March of 2021. (Doc. 54, at 21–22.)

While Plaintiffs never used the words "FCA violation" or "*qui tam*" they are not required to. *See Crockett*, 721 F. App'x at 461. Erlanger "would have understood" these complaints about concurrent surgeries, "to implicate fraud on the government."[17] *Id.* As noted above, *see supra* Section III.A.i.b., Erlanger is a sophisticated player in the healthcare industry which would understand that complaints about overlapping surgeries in conjunction with warning about "potential violations of federal statutes" to implicate the FCA. (Doc 51, at 19.) CEO Jackson's statement that Plaintiffs represented a "threat to the enterprise" (Doc. 54, at 22) and Erlanger

---

[17] While it is true that Plaintiffs did not use the magic words, "FCA violation" or "*qui tam*," they are not required to do so. *See Crockett,* 721 F. App'x at 461 (holding that it is not necessary that a plaintiff specify that her objections "were founded in concerns about improper government disbursements").

telling Dr. Stephen Adams that a report containing examples of non-compliant surgeries "creat[ed] too much liability for the organization" further suggest that Erlanger understood that Plaintiffs' efforts implicated the FCA. (Doc. 52, at 34.).

Erlanger argues that Plaintiffs were not engaged in protected conduct because their goal in attempting to stop non-compliant overlapping surgeries was to protect patient health, not stop fraud on the Government. (Doc. 118, at 30.) The Court does not doubt that protecting patient health was a part of what motivated Plaintiffs' actions. Plaintiffs are physicians whose first and foremost duty is to ensure the wellbeing of their patients. It seems clear however, that Plaintiffs had multiple motivations, including stopping fraud from being committed against the government. The Court can find no caselaw supporting the proposition that a plaintiff having multiple aims in attempting to stop a defendant's conduct defeats an FCA retaliation claim. In fact, Sixth Circuit precedent suggests the opposite. *See Crockett*, 721 F. App'x at 462 (rejecting a defendant's argument that because "[plaintiff's] complaints related to a purported lack of professional standards [by defendant] rather than a specific fraud on the government" that her retaliation claim must be dismissed).

Erlanger further argues that it did not know that Plaintiffs were attempting stop the FCA violation because Plaintiffs had not "[made] clear their intentions of bringing or assisting in an FCA action." (Doc. 118, at 31.) In support of this argument, Erlanger relies on Sixth Circuit precedent which interpreted an outdated version of the FCA retaliation provision, *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003).[18] Prior to 2009, the FCA protected an

---

[18] Erlanger notes that the Sixth Circuit appeared to apply this rule in a recent decision, *United States ex rel. Sheoran v. Wal-Mart Stores E., LP*, 858 F. App'x 876 (6th Cir. 2021). (Doc. 118, at 31.) However, upon examination of the district court's decision in that case, it appears that the protected activity the plaintiff alleged he was engaged in was bringing an FCA claim, rather than attempting to stop an FCA violation via internal reporting. *See United States ex rel. Sheoran v.*

employee from retaliation only if they acted "in furtherance of [an FCA] action." *Id*. at 566. The Sixth Circuit therefore held that to plead a retaliation claim, a plaintiff must show that "defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action." *Id.* at 567. However, in 2009, the FCA was amended to expand the definition of protected conduct from simply bringing or assisting a *qui tam* action to include "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730. The Sixth Circuit therefore held that "pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual *qui tam* action is no longer applicable." *Miller v. Abbott Lab'ys*, 648 F. App'x 555, 560 (6th Cir. 2016); *see United States ex rel. Dunn v. Procarent, Inc.*, 615 F. Supp. 3d 593, 622 (W.D. Ky. 2022) ("[T]he Court must consider [Plaintiff's] retaliation claims in light of the 2009 and 2010 amendments.").

Courts in this circuit, including the Sixth Circuit itself, have not applied the outdated *Yuhasz* standard, and the Court will decline to do so as well. *See Crockett*, 721 F. App'x at 461 (finding that a plaintiff had stated a claim for retaliation when an employer was aware of her internal complaints despite her never explicitly mentioning the FCA); *United States v. Univ. of TN Med. Ctr. Home Care Servs.*, LLC, No. 3:17-CV-96, 2021 WL 3743189, at *14 (E.D. Tenn. Aug. 23, 2021) ("Allegations that an employee has reported or complained to supervisors about possible fraud on the government are sufficient to meet [the notice] element."); *Mcfeeters v. Nw. Hosp., LLC*, No. 3-13-0467, 2015 WL 328212 (M.D. Tenn. Jan. 23, 2015) (finding that a

---

*Wal-Mart Stores E., LP*, No. CV 13-10568, 2019 WL 3936393 at *5 (E.D. Mich. Aug. 20, 2019) ("Relator plead[s] neither facts establishing that Walmart had knowledge of his intent to file an FCA claim nor that he was discharged as a result of his FCA claim (filed almost a month after his discharge).") (emphasis added). Therefore, the Court concludes that *Sheoran* does not implicate cases such as this, where the protected conduct alleged is internal reporting aimed at stopping an FCA violation.

defendant was aware of a plaintiff's attempts to stop an FCA violation when "she [] notified the hospital CEO, Assistant CEO, and two of her supervisors in writing that she had reported their misconduct to Medicare").

Because Plaintiffs have alleged facts suggesting that they were engaged in protected activity and that Erlanger was aware of this activity, they have stated a claim for FCA retaliation.

## D.    Tort Claims

At the pleading stage, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the truth of all well-pleaded factual allegations in the complaint. *Thurman*, 484 F.3d at 859. Here, Plaintiffs have adequately alleged that Erlanger engaged in a variety of tortious behavior.[19] (Doc. 54, at 31–34).

### i.    Breach of Contract

The elements of common law breach of contract in Tennessee are: "(1) the existence of a valid and enforceable contract, (2) a deficiency in the performance amounting to a breach, and (3) damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). While breach most clearly occurs when an explicit term is violated, "contracts may be accompanied by implied duties, which [when violated] can result in a breach." *Id*. A duty of good faith and fair dealing is implied in every contract under Tennessee law, including employment contracts.[20] *See Williams v. Maremont Corp.,* 776 S.W.2d 78, 81 (Tenn. Ct. App.

---

[19] In its briefings, Erlanger simply asks that Plaintiffs' "state law claims be dismissed for failure to adequately plead the claims under Rules 8(a), 9(b), and/or 12(b)(6)." (Docs. 118, at 32.) It does not suggest why.

[20] Tennessee law is not entirely clear as to whether, or to what extent, an implied duty of good faith applies to at-will employment contracts. *Goot v. Metro. Gov't of Nashville & Davidson*

1988) ("This [employment] contract, as all contracts, impliedly provides for good faith and fair dealing between the parties."). "What this duty consists of, however, depends upon the individual contract in each case." *Town & Country Equip., Inc. v. Deere & Co., Inc.*, 133 F. Supp. 2d 665, 668 (W.D. Tenn. 2000).

Here, Plaintiffs entered employment contracts with Erlanger. (Doc. 51, at 16.) Plaintiffs argue that these contracts included "an implicit duty of good faith" which "[Erlanger] violated by terminating [Dr. Julie Adams and Dr. Steinmann]" in response to their efforts to prevent FCA violations and ensure patient safety.[21] (Doc. 54, at 22, 31–32.) Plaintiffs further state that Dr. Julie Adams and Dr. Steinmann were told their termination had "nothing to do with their delivery of medical care." (*Id.* at 22.) It seems clear that, depending on what evidence a jury credits, it could find that terminating Plaintiffs under these circumstances constitutes a breach of the duty of good faith and fair dealing. Finally, this termination damaged Plaintiffs by causing them to lose their salaries at both Erlanger and UTCOM. (*Id.* at 31–34.)

---

*Cnty.*, No. M200302013COAR3CV, 2005 WL 3031638 at *7 (Tenn. Ct. App. Nov. 9, 2005). The weight of the caselaw suggests the duty of good faith does not prevent an employer from firing an at-will employee for any reason, including as retaliation for exercising a legal right. *See, e.g.*, *Sudberry v. Royal & Sun All.*, 344 S.W.3d 904 (Tenn. Ct. App. 2008) (finding that an employer did not breach the duty of good faith when it fired an at-will employee in retaliation for his filing a worker's compensation claim). Plaintiffs allege that at least Dr. Steinmann was employed for a term of years and therefore was not an at-will employee. (Doc. 51, at 19.) It is not entirely clear whether Dr. Julie Adams and Dr. Stephen Adams were employed for a term of years as well, but the Court construes the complaint as alleging that they were.

[21] While Plaintiffs acknowledge that Dr. Stephen Adams was not fired and instead resigned, Tennessee law recognizes the theory of constructive discharge. *See Crews v. Buckman Lab'ys Int'l, Inc.*, 78 S.W.3d 852, 865 (Tenn. 2002) ("[W]e now conclude that allegations of a constructive discharge are generally sufficient to establish the element of termination under a common-law action for retaliatory discharge."). The Court construes the complaint as alleging that Erlanger breached its contract with Dr. Stephen Adams by constructively discharging him. (Doc. 54, at 25 ("Erlanger's leadership elected to continue its retaliation [towards Dr. Stephen Adams] by threating his job security, letting him know that they were watching him, and cutting his compensation in terms of bonuses and additional increases in pay.").)

Plaintiffs have therefore plausibly alleged a breach of contract claim against Erlanger.

### ii. *Tortious Interference with Business Relationships*

In Tennessee, to assert an intentional-interference-with-existing-business-relationships claim, a plaintiff must allege: "(1) an existing business relationship with specific third parties . . . ; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means . . . ; and [] (5) damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

Here, Plaintiffs held academic appointments at UTCOM: Dr. Julie Adams was a Professor of Orthopedic Surgery (Doc. 51, at 16–17), Dr. Stephen Adams was a professor in the Department of Family Medicine (*id.* at 15), and Dr. Scott Steinmann served as Chair of the UTCOM Department of Orthopedic Surgery (*id.* at 18–19). "Maintaining membership with Erlanger" was a condition of Dr. Julie Adams and Dr. Steinmann's employment with UTCOM. (*Id.* at 22, 24.) Because of Erlanger's close working relationship with UTCOM, Erlanger would have known this fact. (*Id.* at 19.) Indeed, Dr. Julie Adams' contract with Erlanger explicitly acknowledged her relationship with UTCOM. (Doc. 54, at 24.) Plaintiffs allege that Erlanger intentionally interfered with these relationships as part of its "retaliatory plan" against Plaintiffs and that it used improper means, *i.e.*, its wrongful termination of Plaintiffs, to achieve this goal. (*Id.* at 23–24.) Finally, this interference resulted in damages to each Plaintiff. Dr. Julie Adams and Dr. Steinmann lost their UTCOM salaries.[22] (*Id.* at 23.) Dr. Stephen Adams was barred

---

[22] Dr. Julie Adams earned $70,000 per year from her UTCOM salary and Dr. Steinmann earned $250,000 per year. (Doc. 54, at 23.)

from participating in resident education and direct patient care in general (*id.* at 15–16) and, as a result, his "ability to maintain clinical privileges [is] at risk." (*Id.* at 25).[23]

Accordingly, Plaintiffs have plausibly alleged Erlanger interfered with their business relationship with UTCOM.

### iii.    *Inducement to Breach of Contract*

Tennessee also provides a statutory remedy for inducement of breach of contract. Tenn. Code Ann. § 47-50-109. "In order to recover on a theory of inducement to breach a contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff." *Givens v. Mullikin ex rel. Est. of McElwaney*, 75 S.W.3d 383, 405 (Tenn. 2002).

Plaintiffs allege that "Erlanger's wrongful termination of [Plaintiffs'] contract was a foreseeable and proximate cause of the ultimate termination of UTCOM's contracts with [Plaintiffs]." (*Id.* at 33.) For the reasons stated above, see *supra* Sections III.D.i-ii., Plaintiffs have plausibly alleged inducement to breach of contract.

### iv.    *Intentional Interference with Prospective Business Relationships*

The elements a plaintiff must establish to prove an intentional interference with prospective business relationships are: "(1) . . . a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to

---

[23] Plaintiffs further allege that they all suffered "ongoing emotional distress, damage to their health and well-being, reputational harm, and damage to their future professional opportunities." (Doc. 54, at 25.)

cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and [] (5) damages resulting from the tortious interference." *Trau-Med*, 71 S.W.3d at 701. In *Trau-Med*, the Tennessee Supreme Court expressly adopted the Restatement (Second) of Torts § 766B, which recognizes "interferences with the prospect of obtaining employment" as a type of tortious interference. *Id*. at 701 n.4.

Dr. Julie Adams and Dr. Steinmann allege that since being terminated by Erlanger they have searched for other full-time jobs at "academic centers and teaching hospitals," representing an identifiable class of third parties. (Doc 54, at 24.) However, after finding numerous "promising prospective opportunities" and advancing far into the interview process, they have been repeatedly rejected. (*Id*.) Plaintiffs allege that this is because "Erlanger, and specifically its employed surgeons and administrators, have purposefully continued their retaliation by spreading malicious falsehoods about [Dr. Julie Adams and Dr. Steinmann]." (*Id*.) Furthermore, it is reasonable to infer that Erlanger knew of these employment opportunities because prospective employers would naturally reach out to Erlanger as it was Plaintiffs' former employer. Plaintiffs further claim that by Erlanger barring Dr. Stephen Adams from direct patient care, his "ability to maintain clinical privileges [is] at risk." (Doc. 54, at 25.) This in turn makes it less likely that he will be able to find employment in a similar setting to Erlanger in the future.

Plaintiffs have plausibility alleged that Erlanger interfered with Plaintiffs' prospective business relationships.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Erlanger's motion (Doc. 117).

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**