UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, ex rel. JULIE ADAMS, M.D., STEPHEN ADAMS, M.D., and SCOTT STEINMANN, M.D., | **FILED UNDER SEAL** |
| *Plaintiffs*, | Case No. 1:21-cv-84 |
| v. | Judge Travis R. McDonough |
| CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY *et al.* | Magistrate Judge Susan K. Lee |
| *Defendants*. | |

**MEMORANDUM OPINION**

Before the Court are Defendant Chattanooga-Hamilton County Hospital Systems, doing business as Erlanger Medical Center and Erlanger Health Systems ("Erlanger"), and the United States of America's motions to dismiss (Docs. 123, 125). For the reasons set forth below, the United States of America's motion (Doc. 123) will be **GRANTED**. Erlanger's motion (Doc. 125) will be **GRANTED IN PART**.

**I.    BACKGROUND**[1]

Plaintiffs filed a *qui tam* complaint on April 20, 2021. (Doc. 1.) The complaint contained a variety of allegations and causes of action, but it primarily alleged that Erlanger violated the False Claims Act ("FCA"). (*Id.*) Specifically, the complaint alleged that Erlanger

---

[1] The Court has already laid out the facts of this case in a related opinion (Doc. 175, at 1–6), and incorporates those facts by reference.

submitted claims which failed to comply with Medicare regulations regarding teaching-physician services.  (*Id*.)  On August 12, 2021, a separate group of plaintiffs filed a *qui tam* complaint in the Western District of North Carolina ("the NC Complaint"), alleging that Erlanger violated the FCA by submitting claims to the Government that were tainted by violations of the Stark Law ("Stark") and Anti-Kickback Statute ("AKS") 42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b(b).  (Doc. 99-1.)  Plaintiffs filed an amended complaint in this action on January 5, 2023.  (Docs. 51–54.)  In their amended complaint, Plaintiffs allege that Erlanger violated the FCA because it improperly incentivized physicians to refer patients to Erlanger by offering them "excessive salaries and benefits" and then submitted claims resulting from those referrals in violation of Stark and AKS.  (Doc 53, at 24.)

The United States and Erlanger both filed motions to dismiss on June 21, 2023.  (Docs. 123, 125.)  Both parties argue that Plaintiffs' FCA claims that are based upon violations of Stark and AKS are barred by the FCA's first-to-file bar.  (*Id*.)  The parties therefore move to dismiss Plaintiffs' FCA claims insofar as the claims are based on Stark and AKS violations.  (*Id*.)  These motions are now ripe for consideration.

II. **STANDARD OF REVIEW**

The FCA states that "[w]hen a person brings a [qui tam action], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."  31 U.S.C. § 3730(b)(5).  This provision is known as the "first-to-file bar" and "prevent[s] successive plaintiffs from bringing related actions based on the same underlying facts."  *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 971 (6th Cir. 2005) (quoting *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001).  "[T]he purpose of the FCA's first-to-file provision is to prevent the filing of more *qui tam* suits once the government

already has been made aware of the potential fraud perpetrated against it." *U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 517 (6th Cir. 2009), *abrogated on other grounds by United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021).

To determine whether the bar applies, "a court must compare the relator's [later-filed] complaint with the allegedly first-filed complaint." *Id.* at 516. If the first complaint "provides the government notice of the *essential facts* of an alleged fraud[,]" then the second complaint is barred. *Walburn*, 431 F.3d at 971 (quotations omitted) (emphasis added). Therefore, if the second complaint is "based in a significant measure on the core facts or general conduct" alleged in the first complaint, then the first-to-file bar applies. *Poteet*, 552 F.3d at 517. This is true even if the second complaint "incorporates somewhat different details," *Walburn*, 431 F.3d at 971, or it alleges the fraud occurred at a different time. *See Poteet*, 552 F.3d at 517 ("[T]he fact that the allegations in [the two] complaints may cover somewhat different time periods is irrelevant . . . ").

Because the purpose of the first-to-file bar is to provide the Government with adequate notice, the Sixth Circuit has held that, for the bar to apply to a later-filed complaint, the first complaint must comply with Rule 9(b)'s requirement that fraud be pled with particularity. *See Walburn*, 431 F.3d at 972 ("[T]he [first] complaint's failure to comply with Rule 9(b) rendered it legally infirm from its inception, and therefore it cannot preempt [the second complaint] under the first-to-file bar.") "To plead fraud with particularity, the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (internal quotations and citations omitted). The purposes of Rule 9(b) are to "alert[] defendants to the precise misconduct with which they are charged and protect[]

3

defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 771 (6th Cir. 2016). While this is a high bar, "so long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

The Sixth Circuit has emphasized that, "Rule 9(b) should be interpreted in harmony with Rule 8's statement that a complaint must only provide a short and plain statement of the claim." *Id.* at 503 (quoting Fed. R. Civ. P. 8(a)). It has also cautioned that "[Rule9(b) should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *Id.*; *see U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) ("When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading"). Therefore, "[a]lthough conjecture and speculation are insufficient under Rule 9(b), [a court] must construe the complaint in the light most favorable to the plaintiff [and] accept all factual allegations as true." *Prather*, 838 F.3d at 771 (citations omitted).

### III. ANALYSIS

Stark bars hospitals, with some exceptions, from billing Medicare for services referred by doctors who have a financial relationship with the hospital. 42 U.S.C § 1395nn(a)(1)(b). A hospital violates Stark when its compensation to an employed physician either: (1) exceeds fair market value for the services the physician personally performs; or (2) varies with the volume or value of the physician's referrals to the hospital, *id*. § 1395nn(e)(2), and the hospital then bills Medicare for services performed pursuant to the physician's referral. Claims for services that

arise from such referrals are *per se* false. Similarly, AKS prohibits "knowingly and willfully" paying physicians to refer services reimbursable by Medicare. 42 U.S.C. § 1320a–7b(a)(1). As with Stark, a claim that is tainted by an AKS violation is a false claim. *Id*. § 1320a–7b(g).

The NC Complaint was filed on August 12, 2021. (Doc. 99-1.) It alleged that Erlanger submitted false claims based on its violations of Stark and AKS.[2] (*Id*.) The NC Complaint claims that in 2013 "Erlanger moved to an aggressive strategy of employing more physicians for the express purpose of adding revenue to its hospitals through increased referrals." (*Id*. at 27.) It further alleges that Erlanger was able to hire hundreds of physicians by "offering and paying total compensation" that was above market value. (*Id*. at 29.) Erlanger allegedly used "Contribution Margin Reports" to calculate which physician salaries to increase based on the number of referrals that they made to Erlanger. (*Id*. at 29–30.) Erlanger then funneled this illicit compensation to high-referring physicians via a bonus system called "work Relative Value Units" ("wRVUs") and bogus academic appointments at University of Tennessee Health Sciences Center College of Medicine ("UTCOM"). (*Id*. at 33–35.) The NC Complaint provides six examples of false claims that stem from referrals made in violation of Stark and AKS. (*Id*. at 38–40.)

While Plaintiffs filed their initial complaint on April 20, 2021 (Doc. 1), it contained only one reference to Stark violations, noting that Erlanger had "flagged Dr. Steinmann's salary as potentially violative of . . . Stark." (Doc. 1, at 92.) It did not reference AKS. (*See generally id.*) Plaintiffs then filed an amended complaint on January 5, 2023, which alleged in detail that Erlanger violated Stark and AKS, though it did not provide a representative claim. (Doc. 53, at

---

[2] The NC Complaint remains under seal. The Government has provided the Court with a partially redacted copy. (*See* Doc. 99-1.) The Court has also conducted an *in-camera* examination of the unredacted complaint.

5

Case 1:21-cv-00084-TRM-SKL   Document 176   Filed 01/19/24   Page 5 of 10
PageID #: 1609

23–40; Doc. 54, at 1–2.) As in the NC Complaint, Plaintiffs' amended complaint states that, in 2013, Erlanger began "expanding aggressively and hiring surgeons as employed physicians in order to secure their referrals" by paying them compensation above fair market value. (Doc. 53, at 25–26.) Plaintiffs suggest, similarly to the NC Complaint, that Erlanger used payments based on wRVUs to incentivize referrals (*id*. at 36) and used academic appointments to UTCOM to disguise this compensation (*id*. at 29). Plaintiffs' amended complaint further claims that Erlanger offered physicians compensation in the form of novel perks, such as by allowing physicians to choose the type of medical equipment they use, in return for increased referrals. (*Id.* at 38.)

The two complaints at issue allege essentially the same fraudulent scheme, with regard to the Stark and AKS claims: Beginning in 2013, Erlanger incentivized physicians to refer patients to Erlanger by paying them excessive salaries.[3] (Doc. 54, at 25–26; Doc. 99-1, at 27.) Furthermore, both complaints suggest that Erlanger used wRVUs and bogus academic appointments to funnel this above-market compensation to physicians. (Doc. 53, at 29, 33; Doc 99-1, at 33–35.) It is true that Plaintiffs' amended complaint contains details the NC Complaint does not, such as laying out additional compensation Erlanger provided physicians. (*See, e.g.*, Doc. 53, at 38.) However, the NC Complaint laid out the strategy Erlanger used to submit false claims in violation of Stark and AKS, as well as the primary methods it used to conceal its surgeons' above-market compensation. (Doc. 99-1, at 27, 33–35.) This is enough to put the Government on notice of the essential details of the alleged fraudulent scheme. *See, e.g., Poteet*, 552 F.3d at 517 (finding that the first-to-file bar applied when two complaints alleged that a

---

[3] Plaintiffs do not argue that the complaints allege separate schemes. (*See* Doc. 134.)

defendant used the strategy of providing "lavish trips" to induce physicians to use a defendant's products).

Plaintiffs nonetheless make several arguments as to why the first-to-file bar does not apply. They first argue that their initial complaint was sufficient to put the Government on notice of violations of Stark and AKS. (Doc. 134, at 5.) However, Plaintiffs' initial complaint never mentioned AKS (*see generally* Doc. 1) and contained only one out-of-context reference to Stark (*id*. at 92). Plaintiffs argue that, despite this fact, the Government should have been able to discern a Stark violation based on the facts of the complaint, namely that UTCOM paid physicians for work they did not perform. (Doc. 134, at 5.) While Plaintiffs did allege that physicians received compensation through UTCOM for work that they did not perform and that this represented "improper inducement," Plaintiffs did not explain what this "inducement" was for or why it was "improper." (*Id.* at 83–85.) Plaintiffs did not suggest, even indirectly, that these UTCOM appointments were given to physicians in exchange for increased referrals to Erlanger. (*Id*.) Nor did Plaintiffs explain that this compensation was above market value, the essential element of a Stark violation. (*Id*.) Without Plaintiffs connecting their allegations to Stark or AKS, the Government cannot be said to have been put on notice by the initial complaint.

Plaintiffs next argue that, because they raised their Stark and AKS claims by amending their complaint, they technically have not "[brought] a related action." (Doc. 134, at 7–8.) Plaintiffs acknowledge that no court has accepted this argument and instead suggest that this Court be the first. (*Id.* at 9.) But the purpose of the FCA is to give the Government notice of fraud. *See Poteet*, 552 F.3d at 517. This purpose would be undermined by a rule that promoted the hasty filing of barebones complaints simply to save one's place in line. The Government

would have to wade through a deluge of vague, hastily filed complaints to find a meritorious one. Numerous other courts have rejected Plaintiffs' exact argument and found it to be contrary to the purpose of the FCA. *See United States ex rel. Bane v. Lincare Holdings, Inc.*, No. 8:06-cv-467, 2008 WL 11472196, at *2 (M.D. Fla. Mar. 14, 2008) ("[R]elation back to circumvent the provisions of § 3730(b)(5) would be contrary to the 'intent and purpose' of the statute."); *United States ex rel. Moore v. Pennrose Props., LLC*, No. 3:11-CV-121, 2015 WL 1358034, at *13 (S.D. Ohio Mar. 24, 2015) ("Under the FCA's first-to-file bar, the filing of an amended complaint does not create an exception to the time-of-filing rule."); *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 14 (D.D.C. 2003) ("While [plaintiff] is literally correct that the language of § 3730(b)(5) makes no reference to amendment, it is clearly outside the intent and purpose of § 3730(b)(5) to permit relation back.").

Finally, Plaintiffs argue that the first-to-file bar does not apply, because the NC Complaint fails to meet Rule 9(b)'s requirement that a complaint plead fraud with particularity.[4] (Doc. 134, at 7.) The NC Complaint provides six false claims that stem from referrals that were made in violation of Stark and AKS. (*Id*. at 38–40.) The examples include the name of the physician who referred the patient, the name of the patient,[5] the approximate date of the referral, where the services were provided, and to what Government payor the claims were submitted. (*Id*.) For instance, example four reads in full:

> **Representative False Claim #4** - Between March 1 and March 3, 2021, Dr. Daniel Kueter, an employed physician whose Stark-violative compensation is described above at ¶¶ 119-121, referred Patient Number #4 for inpatient hospital services at Erlanger Baroness Hospital. Relators have direct knowledge that Erlanger submitted electronic claims for the hospital inpatient services provided to Medicare for Patient #4. Those

---

[4] Plaintiffs do not, however, explain how the specific examples in the NC Complaint fail to comply with Rule 9(b). (Doc. 134, at 7.)

[5] While the NC Complaint does not give the patient names, it states that "Relators provided actual patient names to the United States." (Doc. 99-1, at 38 n.1.)
8

claims were false claims under the FCA.

(*Id*. at 39.)  By giving the names of the physician, the patient, and Government payor, as well as the approximate timeframe of when the patient was referred, the NC Complaint has given Defendant notice of the which claims are alleged to be fraudulent and why they are fraudulent. *See SNAPP*, 532 F.3d at 504 ("[S]o long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met.").  While the NC Complaint does not provide details such as when precisely payment was received and for what amount, it is still sufficient to "alert[] defendants to the precise misconduct with which they are charged." *Prather*, 838 F.3d at 771.  Nor is this a case where a plaintiff "allege[s] simply . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government," *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citations omitted), rather Plaintiffs allege that they have personal knowledge that claims were in fact submitted.[6]  (Doc. 99-1, at 39.)

---

[6] The Sixth Circuit has stated that "the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Chesbrough*, 655 F.3d at 471.  These facts include a relator having:  (1) "personal knowledge that the claims were submitted by Defendants"; (2) "personal knowledge of billing practices or contracts with the government"; or (3) "personal knowledge that was based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government." *Prather*, 838 F.3d at 769 (quotations and citations omitted).

This standard was applied by the Sixth Circuit only once, in *Prather*.  The Sixth Circuit found that despite the plaintiff failing to allege "information regarding . . . [t]he actual submission of a specific request for anticipated payment to the government," Rule 9(b) was nonetheless satisfied because the plaintiff's job involved reviewing claims before they were submitted to Medicare. *Id*. at 770.  Key to the court's decision was the fact that the plaintiff had also provided a "detailed overview of the alleged fraudulent scheme." *Id*. at 769.  The court found that plaintiff's personal

The first-to-file bar applies and therefore Plaintiffs may not pursue false claims arising out of Stark and AKS violations.

IV. **CONCLUSION**

For the reasons above, the Court **GRANTS** United States of America's motion (Doc. 123). It also **GRANTS IN PART** Erlanger's motion (Doc. 125).[7] Plaintiffs may not pursue false claims arising out of Stark and AKS violations.

**SO ORDERED.**

/s/ *Travis R. McDonough*
TRAVIS R. MCDONOUGH
UNITED STATES DISTRICT JUDGE

---

knowledge of billing practices, taken together with her detailed allegations, raised a "strong inference that the specific requests . . . were submitted" and therefore Rule 9(b) was satisfied. *Id*.

Even if the NC Complaint did not meet the Rule 9(b) pleading standard, it would be appropriate to apply to the *Prather* standard here. The Court has conducted an *in-camera* review of the unredacted NC Complaint. In order to avoid revealing the identities of the North Carolina relators, the Court cannot discuss in detail their positions or employment history. However, the Court finds that the North Carolina relators, due to the nature of their positions at Erlanger, have personal knowledge that claims were submitted by Erlanger, as well as in-depth knowledge of Erlanger's billing practices. Furthermore, the NC Complaint provides specific details of the alleged fraudulent scheme and identifies key details of specific false claims that were allegedly submitted to the Government. (Doc. 99-1, at 38–40.) Relators' personal knowledge, combined with the details of the fraudulent scheme that the NC Complaint provides, raises a "strong inference" that specific false claims were submitted. *See Prather*, 838 F.3d at 770 ("[Plaintiff's] detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment, combined with her specific allegations regarding requests for anticipated payment, also creates a strong connection between the requests for anticipated payment and the requests for final payment.").

[7] The bulk of Erlanger's motion to dismiss is addressed in the Court's related opinion. (Doc. 175.)