UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, ex rel. JULIE ADAMS, M.D., STEPHEN ADAMS, M.D., and SCOTT STEINMANN, M.D., | Case No. 1:21-cv-84 |
| *Plaintiffs*, | Judge Travis R. McDonough |
| v. | Magistrate Judge Susan K. Lee |
| CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY *et al.* | |
| *Defendants*. | |

## MEMORANDUM OPINION

Before the Court are Defendants Anesthesiology Consultants Exchange, P.C., University Surgical Associates, P.C., and The Plastic Surgery Group's (collectively, "Specialist Defendants") motions to dismiss the claims against them (Docs. 104, 107, 111).[1]

For the reasons set forth below, Defendant Anesthesiology Consultants Exchange's motion (Doc. 104) and University Surgical Associates' motion (Doc. 107) will be **GRANTED IN PART** and **DENIED IN PART**. Defendant Plastic Surgery Group's motion will be **GRANTED** (Doc. 111.)

---

[1] The Court will address Defendant Erlanger's motion to dismiss (Doc. 117) in a separate opinion.

## I. PLAINTIFFS' ALLEGATIONS AND PROCEDURAL POSTURE

Defendant Chattanooga-Hamilton County Hospital System, which does business as Erlanger Medical Center and Erlanger Health System ("Erlanger"), is a non-profit, regional health system that operates seven hospitals in Tennessee, North Carolina, and Georgia. (Doc 51, at 19.) This includes Erlanger Baroness Hospital, an academic teaching hospital, with approximately 150 residents and fellows participating in graduate-level training. (*Id.* at 19–20.) Erlanger is affiliated with University of Tennessee Health Sciences Center College of Medicine ("UTCOM") and is the primary UTCOM campus in Chattanooga. (*Id.* at 19.)

Defendant Plastic Surgery Group ("PSG") is a limited liability company that contracts with Erlanger to provide services to its patients. (*Id.* at 21.) Defendant University Surgical Associates, P.C., ("USA") is a Tennessee corporation, the physicians of which have admitting and surgical privileges at Erlanger. (*Id.*) USA surgeon Dr. Phillip Burns sat on the Erlanger Board of Trustees ("Erlanger Board"). (*Id.* at 22.) Defendant Anesthesiology Consultants Exchange, P.C., ("ACE") is a Tennessee corporation that is the sole provider of anesthesia services at Erlanger, including for surgical procedures. (*Id.* at 21.) ACE anesthesiologist Dr. Christopher Young sat on the Erlanger Board. (*Id.*)

Plaintiffs are physicians whom Erlanger formerly employed. (*Id.* at 6.) Dr. Julie Adams was an orthopedic surgeon at Erlanger and a Professor of Orthopedic Surgery at UTCOM from July of 2019 until March of 2021. (*Id.* at 16–17.) Dr. Stephen Adams became the Chief Medical Informatics Officer at Erlanger in 2014 and later served as the Chief Information Officer at Erlanger from December 2019 until June 2021. (*Id.* at 16.) He was also a professor in the Department of Family Medicine at UTCOM. (*Id.* at 15). Dr. Scott Steinmann was a surgeon at

Erlanger and served as Chair of the UTCOM Department of Orthopedic Surgery from 2019 until July 2021. (*Id.* at 18–19.)

The Medicare Program is a federal health-insurance program for Americans aged 65 and older, as well as some people with disabilities. (*Id.* at 24.) To participate in the Medicare Program, hospitals must enter into "Provider Agreements" with the United States Department of Health and Human Services ("HHS"). 42 U.S.C. § 1395cc. Under these agreements, a hospital submits claims to HHS for reimbursement for services it provides to Medicare beneficiaries. (Doc. 51, at 26–27.)

In teaching hospitals, resident physicians often participate in providing these services under the supervision of teaching physicians. (*Id.* at 27.) However, Medicare regulations only allow payment for teaching-physician services if the teaching physician personally provided the services, or if a resident provided the services while the teaching physician was present. 42 C.F.R. § 415.170. "In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure." *Id.* § 415.172(a)(1). If the teaching physician engages in two surgeries that overlap, she can only leave the first surgery once the critical portions are completed. Dep't of Health & Hum. Servs., Medicare Claims Processing Manual Ch. 12, at § 100.1.2.A.2 (2019). Even then, the teaching physician must designate another qualified physician to be available to assist the resident during the non-critical portions of the procedure. *Id.*

Plaintiffs allege that, in the course of their employment at Erlanger, they became aware teaching physicians were frequently permitted to conduct multiple resident-involved surgeries at the same time while submitting claims for the surgeries to Medicare as if the teaching physicians

were present for the duration of each surgery.  (Doc. 51, at 38.)  Plaintiffs learned that it is a "long entrenched tradition" for surgeons to operate in this way at Erlanger.  (*Id.* (internal quotations omitted).)  Plaintiffs witnessed teaching physicians double- and triple-booking surgical procedures in which residents were involved, making it impossible for them to be immediately available to assist the residents if needed.  (Doc. 52, at 1.)  Furthermore, Plaintiffs were told that "Erlanger [didn't] even comply" with the Medicare rule that a backup surgeon be designated to assist the residents when surgeries overlap.  (*Id.* at 2.)  This practice left residents alone to conduct some or all of a surgery without supervision.  (*Id.*)  Plaintiffs identified a total of 8,497 overlapping surgeries between 2017 and 2021 for which the Government was billed.  (*Id.*)  Plaintiffs identified ten specific examples of overlapping-surgery claims submitted by Erlanger to the Government.  (*Id.* at 9–27.)  These examples included the time and date of the surgeries for which claims were submitted, the type of surgery performed, the names of the surgeons who performed the surgeries, the amount of the claims, the date the claims were sent to the Government, and the date Erlanger received the payments. (*Id.*)

Plaintiffs also became aware that there was a "culture of non-compliance" with Medicare billing requirements at Erlanger.  (Doc. 53, at 2.)  Plaintiffs discovered a litany of violations of Medicare billing rules, including medically unnecessarily long periods of patients being anesthetized (Doc. 52, at 27), inadequate recordkeeping during surgeries (*id.* at 30), password sharing by physicians (Doc. 53, at 5), patients being admitted by non-physicians (*id.* at 17), patient test results not being reviewing by physicians (*id.* at 18), and the fabrication of patient physical examinations pre-surgery (*id.* at 21).  Plaintiffs also allege they discovered that Erlanger improperly incentivized physicians to refer patients to Erlanger by offering them "excessive

salaries and benefits" in violation of the Stark Law and Anti-Kickback Statute, 42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b(b). (Doc 53, at 24.)

Over the course of many months, Plaintiffs raised their concerns about these alleged practices on multiple occasions with senior Erlanger leadership, including with Erlanger CEO Dr. William Jackson and Erlanger's Chief Compliance Officer, Julie Dean. (Doc. 54, at 14.) Plaintiffs notified them about billing issues and "potential violations of federal statutes." (*Id.*) Plaintiffs also raised these concerns with USA Surgeon Dr. Burns (*id*. at 15) and ACE anesthesiologist Dr. Young (Doc. 52, at 2.) Additionally, Plaintiffs submitted an "e-safe" report detailing their concerns. (Doc. 54, at 21.) An e-safe report is intended to be a confidential means of raising concerns with Erlanger's Medical Executive Committee. (*Id.* at 21–22.) The day after Plaintiffs submitted their e-safe report, CEO Jackson spoke to the Erlanger Board and argued that Plaintiffs represented a "threat to the enterprise." (*Id.* (alteration omitted)) Shortly after this meeting, on March 29, 2021, Erlanger terminated Dr. Julie Adams and Dr. Steinmann without cause, which put them in danger of losing their academic positions at UTCOM since "maintaining membership with Erlanger" was a condition of their employment. (*Id.* at 22, 24.) Dr. Stephen Adams was threatened with termination and a reduced salary and ultimately resigned in the face of these threats. (*Id.*) He also was banned from participating in resident education. (*Id.* at 25.) Plaintiffs have searched for other positions at teaching hospitals but have not been able to find employment due to Erlanger's continuing campaign of retaliation aimed at assassinating their characters. (*Id.* at 24.)

Plaintiffs initially filed this action on April 20, 2021. (Doc. 1.) Plaintiffs then filed an amended complaint on January 5, 2023. (Docs. 51–54.) Plaintiffs assert ten claims for

5

violations of the Federal False Claims Act ("FCA") and the Tennessee Medicaid False Claims Act ("Tennessee FCA"):

1. 31 U.S.C. § 3729(a)(1)(A); (Count I: Presentment of False Claims)
2. 31 U.S.C. § 3729(a)(1)(B); (Count II: False Records)
3. 31 U.S.C. § 3729(a)(1)(C); (Count III: Conspiracy)
4. 31 U.S.C. § 3729(a)(1)(G); (Count IV: Reverse False Claims)
5. 31 U.S.C. § 3730(h); (Count V: Retaliation)
6. Tenn. Code. Ann. § 71-5-182(a)(1)(A); (Count VI: Presentment of False Claims)
7. Tenn. Code. Ann. § 71-5-182(a)(1)(B); (Count VII: False Records)
8. Tenn. Code. Ann. § 71-5-182(a)(1)(C); (Count VIII: Conspiracy)
9. Tenn. Code. Ann. § 71-5-182(a)(1)(D); (Count IX: Reverse False Claims)
10. Tenn. Code. Ann. § 71-5-183(g); (Count X: Retaliation)

(Doc. 54, 26–31.) Plaintiffs also assert four tort claims under Tennessee law:

1. Breach of Contract
2. Tortious Interference with Business Relationships
3. Inducement to Breach of Contract
4. Intentional Interference with Prospective Business Relationships

(*Id.* at 31–34.) Specialist Defendants filed motions to dismiss on June 8, 2023, (Docs. 104, 107, 111), and these motions are now ripe for consideration.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 8(a)(2)

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[Rule 8] demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the

plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id.* at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the truth of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of truth, however, does not extend to legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. The factual allegations must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.   Federal Rule of Civil Procedure 9(b)**

Rule 9(b) applies in cases in which a plaintiff alleges fraud and requires that "a party [] state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). "To plead fraud with particularity, the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (internal quotations and citation

omitted).

While this is a high bar, "so long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). Furthermore, "[a]lthough conjecture and speculation are insufficient under Rule 9(b), [a court] must construe the complaint in the light most favorable to the plaintiff [and] accept all factual allegations as true." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 771 (6th Cir. 2016) (internal quotations and citations omitted*); see SNAPP*, 532 F.3d at 503 ("[Rule 9(b)] should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules.")

### III. ANALYSIS

Plaintiffs' claims can be divided into four categories: (1) the FCA Payment Claims; (2) the FCA Conspiracy Claim; (3) the FCA Retaliation Claim; and (4) the Tort Claims.[2]

### A. FCA Payment Claims

Under 31 U.S.C. § 3729(a)(1)(A), a person is liable if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the Government. A person is also liable under 31 U.S.C. § 3729(a)(1)(B) if he "knowingly makes, uses, or causes to be made or

---

[2] The Court's analysis of Plaintiffs' Federal FCA claims applies equally to their claims under the Tennessee FCA because the provisions of the Tennessee FCA are coextensive with the Federal FCA. *See United States v. UT Med. Grp., Inc.*, No. 2:12-cv-02139, 2014 WL 12611244, at *4 n.2 (W.D. Tenn. May 21, 2014) ("The elements of [the Federal FCA and Tennessee FCA] are virtually identical. . . . Accordingly, the analysis of the sufficiency of the pleading is equally applicable to both statutory claims."); *see also United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 304 (E.D. Tenn. 2022) ("Both parties agree that the False Claims Act is co-extensive with the Tennessee Medicaid False Claims Act, so the Court will begin and end its analysis with the United States' claims under the False Claims Act.").

used, a false record or statement material to a false or fraudulent claim." Claims brought under Sections 3729 (a)(1)(A) and (a)(1)(B) are often called "direct false claims" because these claims "cause the United States to remit money directly to claimants." *United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 303 (E.D. Tenn. 2022) (citations omitted). Furthermore, "[the FCA] imposes liability on one who accepts overpayment from the government and fails to refund that overpayment—a so-called 'reverse false claim.'" *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017); *see* 31 U.S.C. § 3729(a)(1)(G).

"The FCA . . . is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502–03 (6th Cir. 2007) ("*Bledsoe II*"). Since the FCA is a statute addressing fraud on the Government, allegations that a defendant submitted false claims are subject to Rule 9(b)'s heightened pleading requirements. *Sanderson*, 447 F.3d at 877; *see U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 445 (6th Cir. 2008) ("The elements of an FCA action must be pleaded with the particularity required by Rule 9(b)."). "Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges an FCA violation in compliance with Rule 9(b)." *Bledsoe II*, 501 F.3d at 504; *see also U.S. ex rel. Eberhard v. Physicians Choice Lab'y Servs., LLC*, 642 F. App'x 547, 550 (6th Cir. 2016) ("[The Sixth Circuit] imposes a strict requirement that relators identify actual false claims.") (citations omitted). To plead an FCA violation with sufficient specificity, a plaintiff must allege: "(1) precisely what statements were made in what documents . . . (2) the time and place of each such statement and the person responsible for making [the statement], (3) the content of [the] statements and the manner in which they misled the government, and (4) what the defendants obtained as a consequence of the fraud." *Sanderson*, 447 F.3d at 877 (citations omitted).

Furthermore, when a plaintiff brings an action under the FCA against multiple defendants, she must specifically identify a false claim submitted by each of them. *See U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) ("[E]ach defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.") (citations omitted); *see also Sugarlips Bakery, LLC v. A&G Franchising, LLC*, No. 3:20-CV-00830, 2022 WL 210135, at *10 (M.D. Tenn. Jan. 24, 2022) ("In a fraud case with multiple defendants, Rule 9(b) requires that the plaintiff plead specific allegations as to each defendant's alleged involvement.") (quotations and citations omitted).

Here, Plaintiffs fall short of Rule 9(b)'s requirement that they plead a specific example of a false claim submitted by each Specialist Defendant.[3] While Plaintiffs identify ten claims submitted to the Government by Erlanger for payment for non-compliant overlapping surgeries (Doc. 52, at 9–26), they do not allege Specialist Defendants submitted claims for these procedures.[4] (*See id.* at 11) ("Erlanger submitted Part A and Part B claims to Medicare for Patient 7's surgery"). Plaintiffs allege that there were "8,497 overlapping surgical cases performed at Erlanger" from 2017 to 2021, which resulted in claims being submitted to the

---

[3] Despite their amended complaint frequently referring to "Defendants," the substance of the complaint can only support a finding that their allegations almost exclusively refer to Erlanger alone. (*See generally* Docs. 51–54.) In fact, Specialist Defendants are barely ever mentioned individually. (*Id.*)

[4] Physicians associated with Defendant PSG participated in several surgeries that Plaintiffs specifically identify. (Doc. 52, at 9–26.) Plaintiffs also note that Defendant ACE was the sole provider of anesthesiology services at Erlanger when these surgeries occurred. (Doc 51, at 21.) However, merely identifying a procedure in which a defendant is involved does not satisfy Rule 9(b), because Plaintiffs fail to identify *a claim* submitted by either PSG or ACE. As the Sixth Circuit has explained, "liability [attaches], not to the underlying fraudulent activity . . . but to the claim for payment." *United States ex rel. Owsley v. Fazzi Assocs., Inc.*, 16 F.4th 192, 196 (6th Cir. 2021), cert. denied sub nom. *United States v. Fazzi Assocs., Inc.*, 143 (2022).

Government (*id.* at 2) and that "all of these cases represent false claims because none complied with the backup surgeon requirement." (*Id.*) Plaintiffs claim that "Defendant PSG was involved in 660 of these cases" and that "Defendant USA was involved in 391 of them." (*Id.*) However, out of these hundreds of cases, Plaintiffs do not identify any specific claim that Specialist Defendants submitted. (*Id.*) But Rule 9(b) requires just that. Plaintiffs must identify with specificity at least one fraudulent claim submitted by each Specialist Defendant. *See Sanderson*, 447 F.3d at 877 (citations omitted) (requiring a plaintiff to identify who made a claim, when it was made, its contents, and the amount of the claim).[5]

Because Plaintiffs have not identified any false claims that any Specialist Defendant submitted, Plaintiffs have failed to satisfy the heightened pleading requirement of Rule 9(b).[6] They have therefore, failed to state a claim upon which relief can be granted.

---

[5] Plaintiffs also allege Erlanger presented false claims due to its violations of the Stark Law and Anti-Kickback Statutes. (Doc 53, at 24.) Because Plaintiffs do not allege in their complaint (or argue in their briefings) that Specialist Defendants violated the FCA in this manner, Plaintiffs fail to state a claim against Specialist Defendants on this basis. (*See generally* Docs. 51–54, 135.)

[6] Plaintiffs state in a footnote in their briefings, "[Plaintiffs] can amend to clarify their allegations as well as add additional allegations regarding PSG, USA, and ACE if necessary." (Doc. 135, at 45 n.32, 47 n.34.) This action has been pending for over two years, and Plaintiffs have already amended their complaint once. The Sixth Circuit has held that an informal request for leave to amend, which is raised only in response to a motion to dismiss and which does not explain how amendment would cure the complaint, is improper and should be denied. *See Forrester v. Am. Sec. & Prot. Serv. LLC*, No. 21-5870, 2022 WL 1514905, at *4 (6th Cir. May 13, 2022) ("[W]e have held that a district court may deny leave to amend when the plaintiff neither moved formally to amend nor proffered a proposed amended complaint."); *see also Louisiana Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion within the contemplation of Rule 15(a).").

### B. FCA Conspiracy Claim

"[The FCA] imposes liability on anyone who 'conspires to commit a violation' of the FCA's other prohibitions." *Ibanez,* 874 F.3d at 916 (quoting 31 U.S.C. § 3729(a)(1)(C)). To establish an FCA conspiracy, a plaintiff must show two things: (1) an unlawful agreement made with the purpose of getting a false claim paid; and (2) a false claim that was submitted to the government in furtherance of the conspiracy. *U.S., ex rel., Prather v. Brookdale Senior Living Cmtys., Inc.*, No. 3:12-CV-00764, 2015 WL 1509211, at *17 (M.D. Tenn. Mar. 31, 2015); *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 459 (6th Cir. 2018).

#### *i.* **Agreement**

To plead an FCA conspiracy, a plaintiff must allege facts that plausibly suggest the defendants made an agreement with the purpose of defrauding the government.[7] *Ibanez,* 874 F.3d at 917. While pleading a statement showing there is such an agreement is one way to do this, "general civil conspiracy principles apply [to FCA conspiracy claims]." *U.S. ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 n.3 (7th Cir. 1999); *see United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (applying civil conspiracy principals to an FCA conspiracy claim). Therefore, it is possible to infer the existence of a tactic or express agreement to defraud the government from the conduct of defendants. *See United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 541 (E.D. Pa. 2022) ("The Court can 'infer the existence of an

---

[7] The Sixth Circuit has held that allegations regarding a defendant's purpose or knowledge can be pled generally, even when the underlying claim is subject to Rule 9(b). *See SNAPP*, 532 F.3d at 505 ("[T]he question of whether [Defendant] acted with a particular purpose inquires into [Defendant's] state of mind, and an inquiry regarding [Defendant's] state of mind may only be pled generally."); *see also Chesbrough*, 655 F.3d at 466 ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

agreement' between [defendants] to violate the False Claims Act"). Indeed, as courts have acknowledged, "conspiracies are rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quotations and citations omitted); *see Jacobs v. Alam*, 915 F.3d 1028, 1043 (6th Cir. 2019) ("[I]t is enough to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy.").

Three facts plausibly suggest that Defendants Erlanger, ACE, and USA had a tacit or express agreement to perform non-compliant overlapping surgeries for the purpose of submitting false claims: (1) the extensive business relationship between Defendants; (2) Defendants' shared motive in performing non-compliant surgeries; and (3) Defendants' actions after being put on notice that their practices violated the FCA. *See Bevill v. Fletcher*, 26 F.4th 270, 283–84 (5th Cir. 2022) (holding that a plaintiff had adequately pled a conspiracy when he alleged facts indicating a close working relationship between the defendants, a common motive, and a meeting between defendants in which a defendant urged the plaintiff's firing).

First, Plaintiffs allege that Defendants worked together on hundreds of non-compliant overlapping surgeries over the course of at least four years. (Doc. 52, at 2.) Plaintiffs allege that there were "8,497 overlapping surgical-cases performed at Erlanger" from 2017 to 2021 which resulted in false claims being submitted to the Government. (*Id.*) Plaintiffs claim that "Defendant USA was involved in 391 of [these cases]." (*Id*.) Plaintiffs allege that ACE was the sole provider of anesthesiology services for surgeries performed at Erlanger, so it is reasonable to infer that ACE participated in the vast majority of these procedures.[8] (Doc. 51, at 21–22.)

---

[8] By alleging these facts, Plaintiffs have adequately demonstrated "when, where or how the alleged conspiracy occurred." *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *17 (M.D. Tenn. Jan. 14, 2013) (citations omitted).

Plaintiffs also allege that "Defendant PSG was involved in 660 [non-compliant overlapping surgeries]" (Doc. 52, at 2.)  This long history of business dealings suggests a relatively high level of knowledge, communication, and coordination between Defendants.  *See Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983) ("The long-running nature of the scheme is also crucial to the inference of agreement").  Defendants ostensibly had some ability to influence a policy of non-compliant overlapping surgeries because ACE physician Dr. Christopher Young and USA surgeon Dr. Phillip Burns sat on the Erlanger Board.[9]  (Doc. 51, at 22–23); *see Gelboim*, 823 F.3d at 781 (noting that courts may weigh "a high level of interfirm communication" in considering whether an agreement was made).  PSG did not have an employee sitting on the Erlanger Board.  (*See generally* Docs. 51–54.)

Second, Defendants shared a financial motive to perform non-compliant overlapping surgeries.  By doing so, Defendants were able to bill Medicare for a greater number of services and therefore generate more revenue.  (*See* Doc. 52, at 3 ("[Non-compliant overlapping surgeries] were scheduled at or about the same time so that the teaching physician could maximize the number of cases performed by him and his residents.").)  Erlanger could submit more claims to Medicare for teaching physician services than it otherwise would be able to.  (*Id.*)

---

[9] Plaintiffs assert that Doctors Young and Burns were acting as representatives of ACE and USA respectively.  (*See* Doc. 54, at 27 ("Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees")).  ACE and USA deny this.  (*See* Docs. 140–141.)  However, because the alleged conspiracy would benefit ACE and USA, it is reasonable to infer that Doctors Young and Burns were acting consistently with the interests of those entities.  While it may be proven in time that Doctors Young and Burns were acting without the knowledge or authorization of ACE and USA "it is not [the Court's] task at the motion-to-dismiss stage to determine whether a lawful alternative explanation appears more likely from the facts of the complaint."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015); *see Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 517 (6th Cir. 2020) ("A plaintiff's specific allegations of a conspiracy will suffice as long as they are plausible . . . even if a defendant's briefing identifies a more likely alternative explanation for what occurred.") (internal quotations and citations omitted).

ACE could submit claims for longer periods of anesthesia because scheduling non-compliant overlapping surgeries results in patients being under anesthesia for extended periods while they wait for the teaching physician to finish the other overlapping surgeries. (Doc. 51, at 11.) While Plaintiffs do not explicitly state as much, reading the amended complaint as a whole, it appears Plaintiffs intend to allege that at least some USA surgeons are teaching physicians. Therefore, USA would stand to benefit from non-compliant overlapping surgeries because it could submit more claims via its teaching physician members.[10] PSG would presumably benefit as well as Plaintiffs allege that PSG submits claims to Medicare for "some of the bills for [PSG physicians'] professional services." (Doc. 51, at 21.)

Third, Plaintiffs allege that Defendants knew that submitting claims for non-compliant surgeries violated the FCA but continued to do so. Plaintiffs do not suggest that they ever notified any employee of PSG that they may be submitting false claims by participating in non-compliant overlapping surgeries. (*See generally* Docs. 51–54.) Plaintiffs state that they raised their concerns directly with Erlanger's leadership, as well as Doctors Young and Burns, and therefore Erlanger, USA, and ACE had notice.[11] (Doc. 52, at 2); (Doc. 54, at 14–15.) Despite being put on notice, Defendants continued to submit false claims and eventually the Erlanger Board, which Doctors Young and Burns sat on, terminated Plaintiffs when it became clear that they represented a "threat to the enterprise." (Doc. 54, at 22–23.)

---

[10] Plaintiffs have explicitly stated only that USA physicians have admitting and surgical privileges at Erlanger. (Doc. 51, at 21.) It is not entirely clear which services USA physicians generally provide, but the Court interprets the operative complaint as asserting that the USA physicians are teaching physicians at Erlanger. If USA physicians are not in fact teaching physicians, or if USA does not submit claims for services provided by teaching physicians, Defendant USA may seek relief from this order pursuant to Federal Rule of Civil Procedure 60.

[11] Plaintiffs also argue that Defendants knew they were submitting false claims because Plaintiffs "expressly detailed the fraud, including the violation of CMS billing rules in an e-safe report that was reviewed by Erlanger's Board of Trustees." (Doc. 135, at 47–48.)

Drawing all reasonable inferences in favor of Plaintiffs, it is plausible that Erlanger, ACE, and USA had a tacit or explicit agreement to submit false claims. However, Plaintiffs have not alleged facts which allow the Court to infer that PSG was a part of this agreement.

### ii.     Specific False Claim

In addition to alleging an agreement, a plaintiff must also identify a specific false claim submitted to the government as a part of the alleged conspiracy. *See Crockett*, 721 F. App'x at 459 ("An FCA conspiracy requires a "request or demand" intended to be paid by the government.") (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 670 (2008)). This is an indispensable element of an FCA conspiracy claim. *See, e.g.*, *United States v. Wal-Mart Stores E., LP*, No. CV 13-10568, 2019 WL 3936393, at *4 (E.D. Mich. Aug. 20, 2019), *aff'd*, 858 F. App'x 876 (6th Cir. 2021) ("Relator's conspiracy claim fails simply because . . . Relator failed to sufficiently allege any underlying violations of the FCA that would support it.").

Here, Plaintiffs have "identified a particular claim improperly made on the government by virtue of the alleged conspiracy." *Crockett*, 721 F. at 459. As discussed above, *see supra* Section III.A., Plaintiffs specifically identify ten claims that Erlanger submitted for noncompliant overlapping surgeries. (Doc. 52, at 9–26). For reasons discussed in the Court's opinion addressing Defendant Erlanger's motion to dismiss (Doc. 175, at 9–16), these claims satisfy the requirements of Rule 9(b).

Because Plaintiffs have plausibly alleged that Defendants Erlanger, ACE, and USA entered into an agreement with the purpose of violating the FCA and identified a claim submitted in furtherance of the conspiracy, they have stated a claim upon which relief can be granted. Plaintiffs have not plausibly alleged that PSG was involved in such an agreement and therefore fail to state a claim against PSG upon which relief can be granted.

### C. FCA Retaliation Claim

An "employee, contractor, or agent" is protected from being "discriminated against in the terms and conditions of employment because of lawful acts done . . . to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). "In order to establish a claim for retaliatory discharge, a plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).

"Unlike an FCA violation claim, an FCA retaliation claim does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b)." *Crockett*, 721 F. App'x at 460 (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008)). Furthermore, "proving a violation of [the FCA] is not an element of a § 3730(h) retaliation claim." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015) (citations omitted). As a result, even if a plaintiff's other FCA claims are dismissed for failing to satisfy the pleading standard of Rule 9(b), she can still potentially proceed on her FCA retaliation claims. *Crockett*, 721 F. App'x at 460 ("Although [Plaintiff's] three FCA claims about [Defendant's] billing were subject to dismissal, she is entitled to proceed on her FCA retaliation claim").

Plaintiffs fail to plausibly allege that Specialist Defendants took any retaliatory actions against them.[12] Plaintiffs allege that "Defendants" retaliated against Plaintiffs by "refusing to provide or cutting necessary support and resources," "attempt[ing] to abrogate [Plaintiffs']

---

[12] In their briefing in opposition to Defendants' motions to dismiss, Plaintiffs do not argue that Specialist Defendants retaliated against them. (*See generally* Doc. 135.)

contractual agreements," and wrongfully terminating them. (Doc. 54, at 13–14.) However, Plaintiffs do not allege any facts suggesting that any Defendant other than Erlanger took these actions. (*See, e.g.*, *id.* at 15) ("Ultimately, Erlanger's campaign [of retaliation] has resulted in the termination of [Plaintiffs] . . . ."). Nor does it seem possible that Specialist Defendants *could have* "discriminated against [Plaintiffs] in the terms and conditions of employment" since Plaintiffs do not allege that they were in a contractual relationship with Specialist Defendants. 31 U.S.C.A. § 3730(h)(1). *See Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 558 (E.D. Tenn. 2019) ("[R]elief is available to [plaintiffs] who retain an employment, contractual, or agency relationship [with a defendant].").

Because Plaintiffs have not plausibly alleged that Specialist Defendants have engaged in any retaliatory behavior, they have failed to state a claim upon which relief can be granted.

### D. Tort Claims

A bare "the-defendant-unlawfully-harmed-me accusation," is not sufficient to satisfy the pleading standard of Rule 8.[13] *Iqbal*, 556 U.S. at 678 (2009). A complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Here, Plaintiffs broadly allege that "Defendants" engaged in a variety of tortious behavior. (Doc. 54, at 31–34.) However, Plaintiffs' factual allegations only support their claims against Erlanger, not any Specialist Defendant:[14]

1. **Breach of Contract**: Plaintiffs allege that "*Defendant Erlanger* breached its contractual obligations" with them by wrongfully terminating them. (Doc. 54, at 31–32) (emphasis added). Plaintiffs do not allege they were in a contractual relationship with any

---

[13] Because none of the tort claims Plaintiffs alleged requires a showing of fraud, Plaintiffs "need not meet the heightened pleading requirements of Rule 9(b)." *Crockett*, 721 F. App'x at 460.

[14] In their briefing in opposition to Defendants' motions to dismiss, Plaintiffs do not argue that Specialist Defendants committed any tortious acts. (*See generally* Doc. 135.)

Defendant except Erlanger, so there is no basis for the Court to infer that any other Defendant *could have* breached a contract with Plaintiffs. (*See generally* Docs. 51–54.)

2. **Tortious Interference with Business Relationships**: Plaintiffs' theory for tortious interference with business relationships is that "in terminating [Plaintiffs'] employment, Erlanger was well aware it was wrongfully interfering with [their] academic appointments . . . from UTCOM." (Doc. 54, at 23–24.) Plaintiffs also allege that Erlanger staff "met with UTCOM's Dean [Bruce] Shack and again requested the [Plaintiffs] be removed." (*Id.* at 19.) Plaintiffs make no allegations which would allow the Court to infer that any Defendant except Erlanger interfered with their relationship with UTCOM.

3. **Inducement to Breach of Contract**: Plaintiffs allege that "Erlanger's wrongful termination of [Plaintiffs'] contract was a foreseeable and proximate cause of the ultimate termination of UTCOM's contracts with [Plaintiffs]." (*Id.* at 33.) Plaintiffs also allege that Erlanger Orthopedic Medical Director Mark Freeman met with UTCOM's Dean Shack to request their removal. (*Id.* at 19.) Plaintiffs do not allege that Specialist Defendants contacted UTCOM or otherwise induced UTCOM to terminate Plaintiffs' contracts. (*Id.*)

4. **Intentional Interference with Prospective Business Relationships**: Plaintiffs allege that they have been turned down for numerous employment opportunities under suspicious circumstances. (*Id.* at 24.) Plaintiffs state that this is because "Erlanger, and specifically its employed surgeons and administrators, have purposefully continued their retaliation by spreading malicious falsehoods about [Plaintiffs]." (*Id.*) Plaintiffs do not allege that any other Defendants are involved in this campaign of retaliation and there are no facts which suggest that they are. (*Id.*)

Because Plaintiffs have not plausibly alleged that Specialist Defendants have engaged in tortious behavior, they have failed to state a claim upon which relief can be granted.

IV. **CONCLUSION**

For the reasons above, Defendant ACE and USA's motions will be **GRANTED IN PART** and **DENIED IN PART** (Docs. 104, 107). Defendant PSG's motion will be **GRANTED** (Doc. 111.) Because no claims remain against it, Defendant PSG is **DISMISSED** from this action.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**

**UNITED STATES DISTRICT JUDGE**